**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| AIDAN ANDREWS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 4:21-cv-01245-P |
| | ) | |
| STEVEN MCCRAW, et al., | ) | District Judge Mark T. Pittman |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

ARGUMENT ....................................................................................................................... 4

I.     Plaintiffs Have Standing and Their Claims Are Ripe. ........................................... 5

II.    The Second Amendment Protects the Rights of 18-to-20-Year-Olds to Carry Handguns In Public. .......................................................................................... 7

        A.     The Appropriate Standard for Evaluating the Constitutionality of Laws Alleged to Burden Second Amendment Conduct Is Based in Text, History, and Tradition. ........................................................................... 7

        B.     Adults 18-to-20-Years-Old Have Full Second Amendment Rights. ...................... 8

        C.     The Carry Ban Cannot Be Justified Under Any Tier of Scrutiny. ......................... 12

III.   The Court Should Grant Summary Judgment to Plaintiffs on Their As-Applied Challenge to the Carry Ban. .............................................................................. 16

IV.   No Form of Immunity Protects Defendants Glaser and Smith From This Lawsuit. ......... 22

CONCLUSION .................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page**

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
   627 F.3d 547 (5th Cir. 2010) ....................................................................6

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979).........................5, 6

*Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) ...................................25

*Choate v. Redding*, 18 Tex. 579 (1857) ...........................................................1

*Craig v. Boren*, 429 U.S. 190 (1976)...................................................13, 14, 21, 22

*District of Columbia v. Heller*, 554 U.S. 570 (2008)....................................... *passim*

*Ex parte Young*, 209 U.S. 123 (1908).................................................22, 23, 24

*Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006) ...................18

*Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001).......................4

*Gaines v. City of Vicksburg*, 68 F.3d 469 (5th Cir. 1995) ............................................20

*Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020) ......23

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)...................................8

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021)....................................... *passim*

*Hirschfeld v. BATFE*, 14 F.4th 322 (4th Cir. 2021)....................................................9

*In re Cao*, 619 F.3d 410 (5th Cir. 2010) ..............................................................18

*K.P. v. LeBlanc*, 729 F.3d 427 (5th Cir. 2013) ......................................................24

*Lewis v. Casey*, 518 U.S. 343 (1996)...................................................................20

*Mance v. Sessions*, 896 F.3d 390 (5th Cir. 2018) ...................................................8

*McCullen v. Coakley*, 573 U.S. 464 (2014) ...........................................................15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)............................................7, 17

*Missouri v. Jenkins by Agyei*, 491 U.S. 274 (1989)...........................................23, 24

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 700 F.3d 185 (5th Cir. 2012) ............... *passim*

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334 (5th Cir. 2013) ............... *passim*

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338 (5th Cir. 2013) ............. *passim*

*Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442 (5th Cir. 2022) .........22

*Rogers v. Grewal*, 140 S. Ct. 1865 (2020)...............................................................8

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47 (2006).......................6

*Saldano v. State*, 70 S.W.3d 873 (Tex. Crim. App. 2002).........................................3

*Sanders-Burns v. City of Plano*, 594 F.3d 366 (5th Cir. 2010)...................................25

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................................7

*Tercero v. Tex. Southmost Coll. Dist.*, 989 F.3d 291 (5th Cir. 2021) ...................22

*United States v. Anderton*, 901 F.3d 278 (5th Cir. 2018) ...............................18

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952) ..................18

*United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020) ...............................19

*United States v. Rubin*, 609 F.2d 51 (2d Cir. 1979) .........................................11

*United States v. Rubin*, 449 U.S. 424 (1981) ....................................................11

*United States v. Segura*, 747 F.3d 323 (5th Cir. 2014) ...................................11

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ...................................24

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ...................15, 22

## Constitutions and Statutes

U.S. Const. amend. II ........................................................................................9

Tex. Const. art. 5 § 21 .......................................................................................3

Tex. Gov't Code Ann.

    § 402.010(a) .......................................................................................23
    § 411.002(a) .........................................................................................3
    § 411.172(a)(2) .....................................................................................3
    § 411.172(g) ..........................................................................................3
    § 411.172(i) ...........................................................................................3
    § 411.174 ...............................................................................................3
    § 411.174(a)(5) ...................................................................................14
    § 411.174(a)(7) ...................................................................................14
    § 411.174(a)(9) ...................................................................................14
    § 411.177 ...............................................................................................3

Tex. Penal Code Ann.

    § 46.02 ...................................................................................................3
    § 46.15(b)(6) .........................................................................................3

Act of May 8, 1792, ch. 33 § 1, 1 Stat. 271 ....................................................10

Act of Apr. 12, 1871, 12th Leg., R.S., chl. 34, § 1, 6, *in* H.P.N. Gammel, The Laws
    of Texas 1822-1897 (1898) ................................................................1

H.B. 1927, 87th Leg., R.S. (Tex. 2021) ..............................................................1

S.B. 60, 74th Leg., R.S. (Tex. 1995) ...................................................................1

## Other Authorities

Br. for the Governor of Texas for Amicus Curiae in Supp. of Pet'rs, *N.Y. State Rifle &
Pistol Assoc., Inc. v. Bruen*, No. 20-843, 2021 WL 3127147 (U.S. July 20, 2021) .................1

Michael P. O'Shea, *The Steepness of the Slippery Slope: Second Amendment Litigation in the Lower Federal Courts and What It Has to Do with Background Recordkeeping Legislation*, 46 CONN. L. REV. 1381 (2014) ..........................................................................14

Philip J. Cook et al., *Gun Control after* Heller: *Threats & Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041 (2009)...................................................................14

U.S. Census Bureau, QuickFacts Texas, https://bit.ly/3KJIXx2 (accessed March 16, 2022) .......20

# INTRODUCTION

The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580, 581, 592 (2008). In its early history, Texas was a great defender of that right. A late antebellum decision of the Texas Supreme Court declared that "[t]he people of Texas are now, and ever have been, emphatically an armed population." *Choate v. Redding*, 18 Tex. 579, 581 (1857). Although a nineteenth century law restricted the ability of ordinary Texans to carry handguns in public for self-defense for over a century, *see* Act of Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 6, *in* H.P.N. Gammel, THE LAWS OF TEXAS 1822-1897, at 927 (1898), in the last 30 years the state has rolled back these restrictions, first by making Texas a shall-issue state for concealed carry licenses in 1995, *see* S.B. 60, 74th Leg., R.S. (Tex. 1995), and most recently by enacting a permitless carry bill that allows 21-year-old-and-older Texans to carry handguns openly in public without a permit at all, *see* H.B. 1927, 87th Leg., R.S. (Tex. 2021). The State's current Governor has denigrated its earlier restriction on public carriage as a "Reconstruction-era relic" that "force[d] a law-abiding Texan to shed his constitutional right to bear arms when he step[ped] out of his home or his truck," *see* Br. for the Governor of Texas as Amicus Curiae in Supp. of Pet'rs, *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, No. 20-843, 2021 WL 3127147, at *6 (U.S. July 20, 2021), and noted a commitment to the "long cherished . . . right that was confirmed by the Second Amendment, but conferred by God," *id.* at *3.

Nevertheless, Texas *still* forces law-abiding 18-to-20-year-olds to shed their rights when they step out of their homes and trucks. Plaintiffs Aidan Andrews and Jordyn Blakey are adult Americans between the ages of 18 and 21. They may vote, enter contracts, and marry. They are eligible to serve in the military. And yet, under Texas law, they are forbidden from carrying a

1

handgun on their person in public places. This is so even though at the time the Second Amendment was adopted, 18-year-old men were universally understood to be members of the militia, not just allowed but *required* to possess firearms. The Fifth Circuit has already ruled that the laws at issue here survive a facial Second Amendment challenge, so while Plaintiffs seek to have the Fifth Circuit overrule its prior decision, they acknowledge that this Court must grant Defendants' motions for summary judgment on their facial claim.

The as-applied claim is not foreclosed by precedent, however, and Plaintiffs are entitled to summary judgment in their favor because the Second Amendment protects the rights of 18-to-20-year-olds to carry handguns for self-defense and the restriction on the rights of 18-to-20-year-old women who commit hardly any violent crime is not justifiable in the name of crime prevention. In the alternative, the as-applied challenge must succeed because Texas failed to try to accomplish its goal by the less-restrictive means of requiring 18-to-20-year-old women in Texas to acquire a license before carrying a handgun in public.

Defendants make several arguments urging summary judgment in their favor but none are persuasive. Although District Attorneys Smith and Glaser assert that Plaintiffs lack standing to challenge these laws, there is every indication (including an admission from Director McCraw) that if the Plaintiffs were to violate Texas law and carry a handgun illegally, they would face prosecution for doing so. As a result, this case presents a ripe pre-enforcement challenge. On the merits of the as-applied challenge, Director McCraw acknowledges in his brief that 18-to-20-year-old women commit violent crimes at a tiny rate that is nearly identical to the rate of Texans generally. There is absolutely zero basis for singling them out for specially unfavorable treatment.

Plaintiffs respectfully request that the Court grant summary judgment to them on Count II of the Complaint, declare the challenged laws unconstitutional as-applied to 18-to-20-year-old

women such as Plaintiff Blakey, and enjoin its enforcement accordingly.

## BACKGROUND

Plaintiffs challenge the constitutionality of Texas statutes that bar 18-to-20-year-olds from exercising their right to bear arms for the lawful purpose of self-defense. In Texas "[a] person commits an offense if the person intentionally . . . carries on or about his or her person a handgun and at the time of the offense is younger than 21 years of age" unless that person is "on the person's own premises or premises under the persons control, or inside of or directly en route to a motor vehicle or watercraft that is owned by the person or under the person's control." TEX. PENAL CODE ANN. § 46.02 (cleaned up). Texas exempts from this restriction individuals who carry concealed with a license, *id.* § 46.15(b)(6), but licenses are not available to ordinary 18-to-20-year-olds, TEX. GOV'T CODE ANN. § 411.172(a)(2), (g), (i) (carving out exceptions for members or honorably discharged veterans of the military and those under a protective order).

These provisions (collectively, "the Carry Ban") are carried out by the Defendants in this action. Director McCraw oversees the Texas Rangers and the Texas Highway Patrol. He has the duty "to enforce the laws protecting the public safety and provide for the prevention and detection of crime," TEX. GOV'T CODE ANN. § 411.002(a), and he administers the carry licensing regime, *id.* §§ 411.174, 177. Defendants Forrest, Glaser, and Smith are the district attorneys responsible for enforcing the Carry Ban in Parker, Fannin, and Grayson Counties by prosecuting 18-to-20-year-olds who violate the law and carry a handgun on their person. *See Saldano v. State*, 70 S.W.3d 873, 876–77 (Tex. Crim. App. 2002) (en banc); TEX. CONST. art. 5 § 21.

The Individual Plaintiffs (Andrews and Blakey) are responsible, law-abiding 18-to-20-year-old citizens and residents of Texas, who have never been members of the armed forces and are not disqualified by anything but their age from exercising their Second Amendment rights and

carrying a handgun in public for self-defense. Decl. of Aidan Andrews, App.19 ¶¶ 1, 3 ("Andrews Decl."); Decl. of Jordyn Blakey, App.21 ¶¶ 1, 4 ("Blakey Decl."). Andrews lives in Parker County, where Defendant Forrest enforces the Carry Ban. Andrews Decl., App.19 ¶ 1. He is a college student and works a part time job at a grocery store. *Id.* ¶ 6. He owns a CZ 75 Compact handgun that, were it not for the Carry Ban, he would carry for self-defense when out late or running errands. *Id.* ¶¶ 5–6. Blakey lives in Fannin County, where Glaser enforces the Carry Ban, and she attends college and works a retail job in Grayson County, where Smith enforces the Carry Ban. Blakey Decl., App. 21 ¶¶ 1–2. She owns a Sig Sauer P365 handgun that, were it not for the Carry Ban, she would carry for self-defense in both Fannin and Grayson Counties while going to work or running errands. *Id.* ¶¶ 6–7.

Firearms Policy Coalition, Inc. ("FPC") is a nonprofit organization dedicated to promoting the right to keep and bear arms. Decl. of Brandon Combs, App.23 ¶ 3 ("Combs Decl."). FPC has 18-to-20-year-old members, including the Individual Plaintiffs, and brings this action on behalf its members in Texas who have been adversely and directly harmed by Defendants' enforcement of the Carry Ban. *Id.* ¶¶4–6; Andrews Decl., App.19 ¶ 2; Blakey Decl., App.21 ¶ 3, 5.

Defendants McCraw, Smith, and Glaser each moved for summary judgment on all claims on February 18, 2022. *See* Docs. 45, 48, 51. Plaintiffs now oppose those motions and cross-move for partial summary judgment in their favor on the claim that the Carry Ban is unconstitutional as-applied to Blakey and other female members of FPC.

## ARGUMENT

This Court must "review each party's [summary judgment] motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

## I.    Plaintiffs Have Standing and Their Claims Are Ripe.

When challenging the constitutionality of a statue, "a plaintiff need not violate the statute; he may meet [the] injury requirement by showing an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statue, and . . . a credible threat of prosecution thereunder." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 345 (5th Cir. 2013) (cleaned up). There plainly is a credible threat of enforcement here; far from "disavow[ing] any intention" of enforcing the Carry Ban, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979), Director McCraw has admitted that the Ban is actively enforced throughout Texas "and preclude[s] persons matching the description of [the Plaintiffs] . . . from lawfully obtaining a license to carry a handgun . . . [and] such persons without a license to carry a handgun are subject to" punishment for carrying unlawfully. Def. McCraw's Answer, Doc. 38 ¶ 60 (Dec. 23, 2021). That is enough to establish Plaintiffs' standing and the ripeness of their claims.

Smith and Glaser both argue that nevertheless Plaintiffs' claims are not ripe because they have not "been sentenced, prosecuted or even arrested by any law enforcement agency in [their respective counties] for an alleged violation of the statute." Def. Smith's Br. in Supp. of Mot. for Summ. J., Doc. 49 at 9 (Feb. 18, 2022) ("Smith Br."); Def. Glaser's Br. in Supp. of Mot. for Summ. J., Doc. 52 at 5 (Feb. 18, 2022) ("Glaser Br."). But it is, of course, the point of a pre-enforcement challenge that a plaintiff need not suffer the effects of violating a statute to test its constitutionality, as the Fifth Circuit has held in the context of this very Ban. *McCraw*, 719 F.3d at 345. Beyond Plaintiffs' refusal to violate the law before challenging it, Smith and Glaser argue that it is no more than "hypothetical" that Plaintiff Blakey (who resides in Fannin County, where Defendant Glaser enforces the Ban, and attends college and works in Grayson County, where Defendant Smith enforces the Ban) would be subject to enforcement in their counties because she has not stated specifically how often she travels to or where she attends school in Grayson County. Smith Br. 9;

Glaser Br. 5. But Blakey need not be any more specific—she is frequently in both counties and would, if allowed, carry a handgun in *both counties*. Blakey Decl., App.21–22 ¶ 7. Defendants argue that, even so, her injury is *still* hypothetical since, even if she carried, she might not be caught. *See* Glaser Br. 6 ("[E]nforcement of Texas Penal Code § 46.02(a) requires the police to first arrest Plaintiff Blakey in Fannin County before Defendant Glaser could even consider whether to prosecute her for [an] offense."); Smith Br. 10–11. But that type of speculation falls far short of the "disavow[al of] any intention" to enforce the Ban that would be required to call into question Blakey's standing to challenge it. *Babbitt*, 442 U.S. at 302.

Smith and Glaser also argue that FPC and Andrews have no standing against them. First, if Blakey has standing against them, it does not matter that Andrews does not (he has standing, on the same basis as Blakey, against Defendant Forrest). *See* Andrews Decl., App.19 ¶¶ 1, 6. If one plaintiff has standing to sue each defendant, this Court's jurisdiction is secure. *See Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Furthermore, FPC also has associational standing to sue Glaser and Smith. Associational standing allows membership organizations to challenge a law's constitutionality if:

> [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). This lawsuit is germane to FPC's purpose, which is to "defend and promote the People's rights— including the right to keep and bear arms—advance individual liberty, and restore freedom." Combs Decl., App.23 ¶ 3. Indeed, Smith and Glaser do not argue that either the second or third element of the test is not met. They only argue it is improbable "that a member [of FPC] might be harmed somewhere in Texas." Smith Br. 12; Glaser Br. 8. But as explained above, Blakey—who

is a member of FPC—has standing in her own right, so FPC has standing as well. *See Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 700 F.3d 185, 191–92 (5th Cir. 2012) ("*NRA I*") (finding NRA had associational standing on behalf of 18-to-20-year-old members in similar Second Amendment challenge). *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009), on which Smith and Glaser rely, is not to the contrary. In that case the Supreme Court rejected standing based on general allegations by an organization that "there [was] a statistical probability that some of [its] members [were] threatened with a concrete injury." Instead, it "required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 497–98. That requirement is met as to Smith and Glaser by Blakey.

## II.     The Second Amendment Protects the Rights of 18-to-20-Year-Olds to Carry Handguns In Public.

### A.   The Appropriate Standard for Evaluating the Constitutionality of Laws Alleged to Burden Second Amendment Conduct Is Based in Text, History, and Tradition.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "[O]n the basis of both text and history," the Supreme Court held in *Heller*, the Amendment confers "an individual right to keep and bear arms." 554 U.S. at 595. The Court later reaffirmed in *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010), that this guarantee was "among those fundamental rights necessary to our system of ordered liberty."

In both *Heller* and *McDonald*, the Court "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." *Id.* at 785; *see also Heller*, 554 U.S. at 634. Instead, the Court looked to the text of the Second Amendment, *see Heller*, 554 U.S. at 576–600, the historical evidence of its original public meaning, *id.* 634–35, and tradition in the form of post-ratification history, 554 U.S. at 605, to determine whether the firearms regulations at issue in those cases were permissible. Following this example, at least seven

current Fifth Circuit judges and one Supreme Court justice have recognized that "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Mance v. Sessions*, 896 F.3d 390, 395 (5th Cir. 2018) (en banc) (Elrod, J., dissental); *accord Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller II*"); *see also Rogers v. Grewal*, 140 S. Ct. 1865, 1866 (2020) (Thomas, J., dissenting from the denial of certiorari, joined by Kavanaugh, J.) ("Consistent with [*Heller*'s] guidance, many jurists have concluded that text, history, and tradition are dispositive in determining whether a challenged law violates the right to keep and bear arms.").

Nevertheless, contrary to *Heller* and *McDonald*, the Fifth Circuit has adopted a two-step approach in which "the first step is to determine whether . . . the [challenged] law regulates conduct that falls within the scope of the Second Amendment's guarantee" and "the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *NRA I*, 700 F.3d at 194. The Fifth Circuit has upheld the Carry Ban against a facial challenge on the second step of this approach. *McCraw*, 719 F.3d at 349. The test from *NRA I* and the approval of the Carry Ban in *McCraw* are both incompatible with the Second Amendment's text, history, and tradition and should be overruled by the en banc Fifth Circuit.

### B.  Adults 18-to-20-Years-Old Have Full Second Amendment Rights.

Recognizing that *McCraw* binds this Court, Plaintiffs do not oppose entry of summary judgment in Defendants' favor on their facial challenge based on the Fifth Circuit's holding that the Carry Ban satisfies intermediate scrutiny. *See id*. Plaintiffs *do* oppose, however, entry of summary judgment (as Defendants urge) on the first element of the *NRA I* test. The Carry Ban prevents ordinary law-abiding 18-to-20-year-olds from carrying a handgun and the text of the

8

Amendment and history from the founding era proves that this activity "falls within the scope of the Second Amendment's guarantee."

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. When the Amendment describes a right of "the people" to bear arms, it makes no mention of age. *See Hirschfeld v. BATFE*, 5 F.4th 407, 421 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322, 328 (4th Cir. 2021) ("[T]he exchange of ideas between the panel and dissent will remain available as a persuasive source."). The phrase "the people" is used in just two other amendments—the First and the Fourth, *see Heller*, 554 U.S. at 579—and both of those amendments apply to all people regardless of age, *Hirschfeld*, 5 F.4th at 422 (collecting cases). Furthermore, every other constitutional right, even those rights that do not apply equally regardless of age, applies at least to those 18 or older. *Id.* at 423 (discussing jury trial right and unenumerated rights of marriage and sex).

History reinforces the conclusion that 18-year-olds were included within the Second Amendment's protections. The prefatory clause, "[a] well regulated Militia, being necessary to the security of a free State," "announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 595, 599. Therefore, although the right is not limited to those with a duty to serve in the military (it is unquestionably broader and includes, for example, women), "[l]ogic demands that there be a link between the stated purpose and the command." *Id.* at 577; *see also Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (en banc) (Jones, J., dissental) ("*NRA II*") ("Gun ownership was necessary for militia service; militia service was not necessary for gun ownership."). The "militia' referenced in the prefatory clause was not an organized army but rather the collection of "all able-bodied men." *Heller*, 554 U.S. at

596. And "[n]ear the time of ratification, the federal government and every state required 18-year-old men to be part of the militia and bring their own arms." *Hirschfeld*, 5 F.4th at 424; *see NRA II*, 714 F.3d at 339 (Jones, J., dissental). The first federal act addressing the composition of the militia was enacted in 1792, just a year after the passage of the Second Amendment. It called for enrollment of "each and every free able-bodied white male citizen of the respective state[ ], resident therein, who is or shall be of the age eighteen years and under the age of forty-five years," Act of May 8, 1792, ch. 33 § 1, 1 Stat. 271, 271. State militia laws followed suit. While pre-ratification many states began enlistment at 16, after the federal law set the age at 18, "every state also set their militia age at 18." *Hirschfeld*, 5 F.4th at 428–29; *see also id.* at 453–57 (App'x 1). "Like the federal Militia Act, these state militia laws required enrolled citizens, including 18-year-olds, to bring their own firearms and ammunition either explicitly or as a general background principle." *Id.* at 428. In short, "the historical basis for those 18 and older having Second Amendment rights rests on firm ground." *Id.* at 440.

Defendants claim these arguments are foreclosed because the Fifth Circuit has held that restrictions placed on this age group fall outside of the scope of the Second Amendment. *See* Def. McCraw's Br. in Supp. of Mot. for Summ. J., Doc. 46 at 9, 11 (Feb. 18, 2022) ("Director Br."); Smith Br. 19; Glaser Br. 14. In both *NRA I* and *McCraw*, the Fifth Circuit stopped short of holding any such thing. Rather, the panel in *NRA I* acknowledged that it "face[d] institutional challenges in conducting a definitive review of the relevant historical record," so that "[a]lthough [it was] inclined to uphold the challenged federal laws at step one," the determinative step was the second in both cases. *NRA I*, 700 F.3d at 204; *see also McCraw*, 719 F.3d at 347 ("[T]he conduct burdened by the Texas scheme *likely* 'falls outside the Second Amendment's protection.' " (quoting *NRA I*, 700 F.3d at 203) (emphasis added)). The Fifth Circuit's discussion of the first step is therefore not

10

binding. Neither a judge nor a litigant can "transmute dictum into decision by waving a wand and uttering the word 'hold.' " *United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring), *aff'd*, 449 U.S. 424 (1981); *see United States v. Segura*, 747 F.3d 323, 328–29 (5th Cir. 2014) ("If a statement is dictum, we are free to disregard it from prior panel opinions when we find it unpersuasive.") (cleaned up).

Without binding authority, Defendants are left to rely on the persuasive value of the panel opinions in those cases. By that measure, both opinions come up short. The *McCraw* opinion confined its step-one analysis to a single paragraph that summarized the reasoning of *NRA I*, and as for *NRA I*, Judge Jones painstakingly detailed in her dissent from denial of en banc rehearing the ways that decision's "treatment of pertinent history does not do justice to *Heller*'s tailored approach toward historical sources" and "[a] methodology that more closely followed *Heller* would readily lead to the conclusion that 18-to-20-year-old individuals share in the core right to keep and bear arms under the Second Amendment." *NRA II*, 714 F.3d at 336 (Jones, J., dissental). Indeed, the *NRA I* opinion's reliance on "random 'gun safety regulations' of the 18th century" to conclude "that these justify virtually any limit on gun ownership" cannot be squared with *Heller*'s much more granular approach to Second Amendment history, *NRA II*, 714 F.3d at 339 (Jones, J., dissental), and starkly contrasts with the comprehensive review of relevant militia laws and other firearms restrictions in *Hirschfeld*. The *NRA I* panel "relegate[d] militia service to a footnote" and even then, although it claimed several states "chose to enroll only those twenty-one and older in their militias . . . both of the examples offered for [that] proposition are wrong." *NRA II*, 714 F.3d at 339, 341. Finally, the *NRA I* panel found it important that, during the founding era, those under 21 were minors, but that is irrelevant. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634–35, and though they

were minors, "the point remains that those minors were in the militia *and, as such*, they were required to own their own weapons. What is *inconceivable*, is any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms," *NRA II*, 714 F.3d at 342 (Jones, J., dissental). And even if minority status were a "historical justification" for limiting Second Amendment rights, *Heller*, 554 U.S. at 635, that justification would not apply here, since 18-20-year-olds in Texas are legal adults. As such, this Court should hold that restrictions on the rights of 18-to-20-year-olds to carry firearms fall within the scope of the Second Amendment.

### C.  The Carry Ban Cannot Be Justified Under Any Tier of Scrutiny.

Although the Fifth Circuit's adoption of a tiers-of-scrutiny approach was error by itself, it compounded the error by failing to apply strict scrutiny to this denial of a fundamental constitutional right. *McCraw*, 719 F.3d at 348. But even under intermediate scrutiny, which requires a showing that a law is "reasonably adapted to achieve an important government interest" that is "genuine, not hypothesized or invented *post hoc* in response to litigation" and not reliant "on overbroad generalizations," *id.* (citations and quotations omitted), the Carry Ban should have been declared unconstitutional.

*McCraw* found that the Carry Ban was reasonably adapted to curbing violent crime, noting that "those under 21 years of age are more likely to commit violent crimes with handguns than other groups." *Id.* The Director argues that the Carry Ban continues to serve this purpose because 18-to-20-year-olds made up 17.5% of non-juvenile arrestees for murder and manslaughter in 2019 and 18.4% in 2020. Director Br. 13. But those rates are not substantially different than for 21-to-23-year-olds who committed 15.4% of those crimes in 2019 and 15.6% in 2020. *See* Ex. 1, Summary of Data from Director's Exs. E & F, App.2. And if focus is not limited to murder and manslaughter, the Director's point is lost entirely. For instance, 21-to-23-year-old Texans commit

slightly *more* aggravated assaults than 18-to-20-year-olds. In 2019, the older group committed 9.7% of all non-juvenile aggravated assaults to the younger group's 8.4% and in 2020 those figures were 9.5% and 8.7% respectively. *See id.* at App.3. And nationally, 18-to-20-year-olds were arrested for 41,250 violent crimes in 2019 while 21-to-24-year-olds were arrested for 58,850 of them. *See* Ex. 2, Off. of Juvenile Justice & Delinquency Programs*, Estimated number of arrests by offense and age group, 2019, Gender: All*, U.S. DEP'T OF JUST., App.6.

More to the point, that 18-to-20-year-olds commit a slightly larger proportion of *some* violent crimes than 21-to-23-year-olds do does not say anything about what proportion of 18-to-20-year-olds commit violent crimes at all. The Supreme Court has made clear that *this* is the relevant question for courts to consider when assessing whether a restriction is overbroad and based on impermissible generalizations about a class of citizens. In *Craig v. Boren*, 429 U.S. 190 (1976), the Court applied intermediate scrutiny and enjoined a law prohibiting the sale of low-alcohol beer to men under 21 (but allowing women 18 and older to buy it). *Id.* at 191. After reviewing statistics showing 18-to-20-year-old males were responsible for a disproportionate number of drunk driving incidents, the court accepted that 2% of males and just 0.18% of females had been arrested for drunk driving but held the law invalid under intermediate scrutiny anyway. *Id.* at 200–02. The Court reasoned, "if maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit.' " *Id.* at 201–02.

The two percent fit in *Craig* is much better than what Defendants can offer here. Nationally, just 0.32% of 18-to-20-years-olds were arrested for violent crimes in 2019. Even if comparison to other groups were appropriate, a greater proportion (0.34%) of 21-to-24-year-olds were arrested. Ex. 3, Off. of Juvenile Justice & Delinquency Programs, *Arrest Rates by offense and age group, Gender: All*, U.S. DEP'T OF JUST., App.8. "[A]n exceedingly small percentage, around 0.3% and

definitely less than 1%, of the 13 million young adults [18-to-20-years-old] commit [violent] crimes." *Hirschfeld*, 5 F.4th at 445. "*Craig* explains why such laws would fail when it declared that 'a correlation of 2% must be considered an unduly tenuous fit.' . . . The rights of more than 99% of a group cannot be restricted because a fraction of 1% commit a disproportionate amount of violent crime." *Id.* at 446 (quoting *Craig*, 429 U.S. at 201–02).

The Carry Ban should also fail intermediate scrutiny for the independent reason that, even if 18-to-20-year-old crime is a serious problem warranting government action, there is no evidence that an outright ban on carriage by 18-to-20-year-olds is reasonably connected to that problem. "It is not enough to target guns generally and argue that less access to guns means less crime, as this would justify almost any restriction and eviscerate the Second Amendment." *Id.* at 447. "Official data from numerous states indicates that shall-issue permit holders are unusually law-abiding compared to the population as a whole and do not commit a significant proportion of violent crimes committed with guns." Michael P. O'Shea, *The Steepness of the Slippery Slope: Second Amendment Litigation in the Lower Federal Courts and What It Has to Do with Background Recordkeeping Legislation*, 46 CONN. L. REV. 1381, 1433 & n.259 (2014); *see also* Philip J. Cook et al., *Gun Control after* Heller: *Threats & Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041, 1082 (2009) ("Based on available empirical data . . . we expect relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand."). That should not come as a surprise given that, as in Texas, applicants for a permit typically must submit to fingerprinting and a background check and demonstrate proficiency in handgun use before a license can issue. TEX. GOV'T CODE ANN. § 411.174(a)(5), (7), & (9). The Carry Ban thus only targets a subset of 18-to-20-year-olds likely to be particularly law-abiding—those who would

apply for and obtain a carry license—further diminishing an already tenuous connection between age and violent crime that Defendants have proffered as justification for the restriction.

The Director gets things precisely backwards when he suggests that Texas's recent enactment of a permitless carry law that allows all ordinary Texans who are at least 21 to carry a handgun without a license should somehow make it *easier* for the Carry Ban to pass intermediate scrutiny. Director Br. 13.[1] In fact the opposite is true. Despite the minor differences between the proportion of homicides and aggravated assaults committed by 18-to-20-year-olds and those committed by 21-to-23-year-olds, Texas has determined that the latter group may carry handguns in public without any sort of background check or training, while even well-trained members of the younger cohort who *would* undergo such a check are denied any avenue by which to exercise their Second Amendment right.

Texas's failure to embrace the substantially less restrictive alternative of requiring 18-to-20-year-olds to acquire licenses to carry is that much more bizarre in light of its enactment of permitless carry. Even under intermediate scrutiny, a State cannot justify a flat ban when it has not "seriously undertook to address the problem with less intrusive tools readily available to it" or, at a minimum, rejected such alternatives for good reason. *See McCullen v. Coakley*, 573 U.S. 464, 494 (2014). That is because in the absence of such tailoring a State impermissibly "burden[s] substantially more [protected conduct] than is necessary to further the government's legitimate interests." *Id.* at 486. In fact, legislative history demonstrates that the legislature exempted

---

[1] The Director also points out that Texas has also amended the Carry Ban to allow 18-to-20-year-olds who are protected by an active protective order to acquire a license to carry, but such minor exceptions from the ordinary rule, requiring an exceptional demonstration of need for personal protection, are irrelevant. "[I]f the Amendment is for law-abiding citizens *as a rule*, then it must secure gun access at least for each *typical* member of that class" measured as "those with common levels of competence and responsibility—and need." *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017).

members or former members of the military from the Carry Ban not based on greater perceived maturity or a propensity for law-abiding behavior, but because they "receive[] extensive training in handling weapons." Doc. 46-3, Director's Ex. C, McCraw 000022. Supporters of the exemption argued that, because of this training, "preventing members under the age of 21 from obtaining a concealed handgun license *serves no purpose*." Doc. 46-4, Director's Ex. D, McCraw 000025 (emphasis added). That Texas permits former members of the military to carry handguns due to their assumed skill with firearms but denies licenses to all other 18-to-20-year-olds (instead of simply requiring them to demonstrate training and skill) cannot satisfy intermediate scrutiny.

### III. The Court Should Grant Summary Judgment to Plaintiffs on Their As-Applied Challenge to the Carry Ban.

Unlike Plaintiffs' facial challenge, no binding precedent controls this Court's decision on the claim that the Carry Ban is unconstitutional as applied to 18-to-20-year-old women under the standard set out in *McCraw*. As discussed above, the Carry Ban regulates conduct that falls within the scope of the Second Amendment and therefore this Court must consider whether the Government can "demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective" when applied to 18-to-20-year-old women. *NRA I*, 700 F.3d at 195.[2] Not only is there no "reasonable fit," in this context, there is scarcely any connection at all between the Government's stated objectives and banning 18-to-20-year-old women from carrying handguns for self-defense.

Women in this age range are exceedingly *unlikely* to commit violent crime, both absolutely and when compared to men who are allowed by Texas law to carry handguns without any licensing at all. In 2019, for example, only 0.13% of 18-to-20-year-old women were arrested for a violent

---

[2] Plaintiffs recognize this Court must apply intermediate scrutiny under *McCraw* but preserve the right to argue that a different standard should apply on appeal.

crime of any type. *See* Ex. 4, Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Females*, U.S. DEP'T OF JUST., App.12. Males 21-to-24, by contrast, were arrested for violent crimes at a rate approximately four times greater (0.51%), and *all* males 25 and over were arrested for violent crimes nearly twice as often (0.23%). *See* Ex. 5, Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 100,000 in age group), Gender: Males*, U.S. DEP'T OF JUST., App.15. The distinction is even greater when it comes to homicide, with 18-to-20-year-old females being arrested for murder or nonnegligent homicides at a minuscule rate of 0.0019%, while 21-to-24-year-old males were arrested for such offenses nearly ten times as often (0.018%) and 25-and-over males more than twice as often (0.0053%). *See* Ex. 4, App.11; Ex. 5, App.14.

These relationships hold true when analyzing Texas's state-specific numbers. In 2019, 21-to-23-year-old Texans committed 15.4% of all homicides in the state (and 21-to-23-year-old men alone committed 14.2% of them). *See* Ex. 1, App.2. Meanwhile, 18-to-20-year-old women committed just 1.4%, one-tenth the rate of 21-to-23-year-old men who have the right to carry without a license at all. *See id.* The raw numbers are similarly clear: 140 21-to-23-year-old men were arrested for murder or non-negligent manslaughter in 2020. *Id.* Just 16 women subject to the Carry Ban were arrested for murder or non-negligent manslaughter that year. *Id.* Texas bans all women 18-to-20-years-old from carrying handguns even though only 16 of them across the entire state were arrested for homicide in a year (and just 11 were arrested the year before). *Id.* That cannot justify such a draconian restriction of their rights.

The inequity of burdening a woman's right to "keep and bear arms for the purpose of self-defense," *McDonald*, 561 U.S. at 750, is all the more stark given that women are disproportionately *victimized* by crime. In 2016, 68,009 18-to-20-year-old women were victims of violent crime,

while just 42,358 men in the same age group were similarly victimized. Ex. 6, Off. of Juvenile Justice & Delinquency Programs, *Easy Access to NIBRS Victims: Most serious offense against victim by Sex of victim for all reporting states, 18 to 20,* NAT'L CENTER FOR JUVENILE JUST., App.18. Texas's purported goal of curbing violent crime is not advanced by stripping 18-to-20-year-old women, who face disproportionate crime victimization, of the right to lawfully carry a handgun for self-defense when a minuscule portion of that group commits any violent crime. *See NRA II*, 714 F.3d at 346–47 (Jones, J., dissental); *Hirschfeld*, 5 F.4th at 446.

In moving for summary judgment on the as-applied claim, the Director argues, as a threshold matter, that this claim is also foreclosed by *McCraw* because the panel, he argues, considered and dismissed this claim "when cast as overbreadth arguments in *McCraw*." Director Br. 14. But "it is well-established that the facial upholding of a law does not prevent future as-applied challenges." *In re Cao*, 619 F.3d 410, 430 (5th Cir. 2010). When an argument was not briefed to a court and not discussed in an opinion, that opinion does not bind a future court to which the argument *is* raised. *See United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 39 (1952); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285 (5th Cir. 2006). The question of whether the Carry Ban was unconstitutional as applied to women specifically was never briefed to, nor discussed by, the Fifth Circuit in *McCraw*. The argument the Commissioner believes forecloses Plaintiffs' as-applied challenge was merely that the Carry Ban facially fails intermediate scrutiny because it "assumes that 18-to-20-year-olds are too immature to carry a handgun in public." *McCraw*, 719 F.3d at 349. In rejecting this argument, all that the Fifth Circuit determined in *McCraw* was that the Carry Ban's targeting of 18-to-20-year-olds generally was not "unconstitutional in all applications or lack[ing] any plainly legitimate sweep." *United States v. Anderton*, 901 F.3d 278, 284 (5th Cir. 2018) (quotations omitted). Whether it is constitutional as-

applied to women in that age range is for this Court to answer.

Smith and Glaser make a similar argument when they assert that "[t]he Second Amendment permits categorical limits on the regulation of gun possession by classes of person." Smith Br. 23 (quoting *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011)); Glaser Br. 18 (same). That may be true, but those categorical limits and regulations still need to be justified in any challenged application against a subgroup or individual. It is *not* true, as Glaser and Smith assert, that the Fifth Circuit "rejects personalized, case-by-case" challenges like this one. Smith Br. 23; Glaser Br. 18. Rather, the court has recognized that its facial upholding of a law against a Second Amendment challenge "does not foreclose the possibility of a successful as-applied challenge." *United States v. McGinnis*, 956 F.3d 747, 759 (5th Cir. 2020) (assessing challenge to 18 U.S.C. § 922(g)(8)). The Court is free to consider Plaintiffs' as-applied challenge.

The Commissioner argues that the as-applied challenge is a disparate impact claim in "disguise," and that this is fatal because "disparate impact claims are not actionable under the Fourteenth Amendment, or under Section 1983" without proof that "(1) the challenged statute was not gender-neutral, and (2) any adverse effect reflects invidious gender-based discrimination." Director Br. 15–16 (citing *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979)). There are several problems with this argument. First, the as-applied claim here is *not* a disparate impact challenge. As the Commissioner correctly notes, the hallmark of a disparate impact claim is the argument that a facially neutral statute "disproportionately burden[s] women." Director Br. 15. But Plaintiffs have argued that the Carry Ban burdens men and women ages 18-to-20 in the same way and to the same degree—it deprives ordinary members of both groups of their Second Amendment right to carry. Instead, what Plaintiffs have argued is that though it burdens men and women equally, the burden is especially *unjustified* as-applied to women who

commit almost no violent crime—far less, in fact, than many groups who are not similarly deprived of their rights. Second, the prohibition on disparate impact claims without proof of discriminatory purpose applies only to actions brought under an equal protection theory. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 375 (1996) ("We rejected a disparate-impact theory of the Equal Protection Clause altogether in *Washington v. Davis*, 426 U.S. 229, 239 (1976)."). It is not surprising therefore, that nearly every case the Director cites for support, *see* Director Br. 15–16, arises in the equal protection context. The sole exception is *Gaines v. City of Vicksburg*, 68 F.3d 469 (5th Cir. 1995) (per curiam), which rejected a disparate impact theory under Title VII of the Civil Rights Act of 1964. Plaintiffs have brought neither a Title VII nor an Equal Protection claim so these authorities have no application in this case.

Finally, the Director argues that, even as applied to 18-to-20-year-old women the Carry Ban fits reasonably well with the State's interest in curbing violent crime and he accuses Plaintiffs of playing "numbers game[s]" in trying to show otherwise. Director Br. 18. First, he argues that it does not matter that 18-to-20-year-old women commit violent crimes at an extremely low rate because people generally commit crimes at very low rates, and he calculates that Texans as a whole commit violent crimes at a rate (0.12% in 2019 and 0.11% in 2020) that is nearly identical to the rate at which 18-to-20-year-old women commit them nationally (0.13% in 2019). Director Br. 18. But by comparing the violent crime rate of 18-to-20-year-olds to all Texans generally, the Director himself engages in a numbers game and slightly understates the actual rate at which adult Texans (74.5% of the population, or 21,713,401 people, in 2020) commit violent crimes. *See* U.S. Census Bureau, QuickFacts Texas, https://bit.ly/3KJIXx2 (accessed March 16, 2022). In 2020, for instance, there were 30,375 adult arrests for violent crimes (murder, manslaughter, rape, robbery, aggravated assault), meaning the crime rate for adult Texans should be approximately 0.14%, not

0.11%. *See* Doc. 46-6, Director's Ex. F, McCraw 000287.[3] Even accepting the Director's numbers, all he has shown is that "women nationwide are arrested, for any crime or for violent crime, at approximately the same rate that Texans generally are arrested for such offenses." Director Br. 18. If that is the case, then why does Texas deny these women the right to carry for self-defense? In *NRA I* and *McCraw*, the Fifth Circuit held restrictions on 18-to-20-year-olds' rights were permissible in light of its belief that the group had an unusually large criminal footprint relative to its share of the population. *See, e.g.*, *NRA I*, 700 F.3d at 210. Nothing in either case would support upholding the Ban against a group that has only an average rate of criminality.

Second, the Director accuses Plaintiffs of "comparing apples to oranges" because while 18-to-20-year-old women admittedly "commit violent crimes, and crimes of any sort [at] a lower rate than men . . . the purpose of the Challenged Provisions is to limit the danger posed by all young people compared to their older counterparts." Director Br. 18. He insists that "the only reasonable analysis requires evaluating whether young women contribute to violent crime in a statistically significant way compared to older women." *Id.* at 19. But he cites no authority for the proposition that this is really "the only reasonable analysis" and it is directly contrary to *Craig*, which rejected the argument that it should uphold the law treating 18-to-20-year-old-men differently than 18-to-20-year-old women because 2% of men of that age were arrested for drunk driving while just 0.18% of women were (so men were arrested *ten times* as often as women). 429 U.S. at 201. The *Craig* Court refused to subdivide the population to find a comparison that might justify the legislation because the question in evaluating the law was whether the targeted class of people drove drunk at such a significant rate (not just compared to another group) that the

---

[3] These calculations are approximations. The Census Bureau considers adults to be individuals 18 or older while Texas considers adults to be individuals 17 or older.

restriction could be justified by legislating against young men as a "proxy" for targeting drunk drivers. *Id.* at 201–02. Here, 18-to-20-year-old women, who were arrested for violent crimes at a rate of just 0.13% in 2019, cannot possibly serve as a "proxy" for violent criminals and Defendants must be enjoined from enforcing the Carry Ban against them.

Smith and Glaser argue that, although they commit few crimes, 18-to-20-year-old women also have less of a *need* for self-defense because they are murdered less often than men in their age range. *See* Glaser Br. 18; Smith Br. 22. Leaving aside that murder is not the only violent crime committed with a firearm and that women suffer other violent crimes at higher rates than men, *see* Ex. 6, App.18, an individual's Second Amendment rights do not rise and fall with their individual (or even class) risk of suffering personal violence. *See Wrenn*, 864 F.3d at 664 ("[T]he Amendment enables self-defense at least against the level of threat *generally* faced by those covered by the Amendment: responsible and law-abiding citizens.").

## IV.    No Form of Immunity Protects Defendants Glaser and Smith From This Lawsuit.

Glaser and Smith argue that sovereign immunity, qualified immunity, or prosecutorial immunity protect them from liability for Plaintiffs' attorneys' fees if Plaintiffs prevail. Even if the Court credits these arguments, neither Glaser nor Smith argue they are shielded from Plaintiffs' claims for declaratory and injunctive relief, so they must remain defendants. In any event, none of these varieties of immunity protect them from an award of attorneys' fees.

Sovereign immunity "generally prohibits private suits against states." *See Tercero v. Tex. Southmost Coll. Dist.*, 989 F.3d 291, 296 (5th Cir. 2021). "Importantly, however, sovereign immunity is not boundless and one of its limits is the *Ex parte Young* doctrine . . . [which] grants a federal court jurisdiction over a lawsuit against a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 450–51 (5th Cir. 2022) (quotations omitted). *Ex parte Young*,

22

209 U.S. 123 (1908), requires: "(1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc). Notably, attorneys' fees incurred in the process of litigating a case are not damages but rather a form of prospective relief, "because they constitute[] reimbursement of 'expenses incurred in litigation seeking only prospective relief,' rather than 'retroactive liability for prelitigation conduct.' " *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 278 (1989) (quoting *Hutto v. Finney*, 437 U.S. 678, 695 (1978)).

Plaintiffs' claims fit squarely within the *Ex parte Young* paradigm. Defendants are state officials named in their official capacities, Plaintiffs have alleged that ongoing enforcement of the Carry Ban violates the Second Amendment, and the only relief they seek is prospective: a declaration that the Carry Ban violates the Second Amendment, an injunction prohibiting Defendants from enforcing the Ban, and the award of attorneys' fees.

Glaser and Smith first argue that because Texas requires the Attorney General to be noticed when a lawsuit is filed in state court alleging a Texas statute is unconstitutional, *see* TEX. GOV'T CODE. ANN. § 402.010(a), that "it follows that, if the Texas Attorney General must receive notice to any challenge to a Texas statute's constitutionality, it is not necessary for any other Texas official to be named as a party in order to challenge a statute's constitutionality," Smith Br. 12; Glaser Br. 8–9.[4] That does not follow. As both defendants elsewhere acknowledge, "[f]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." Smith Br. 14; Glaser Br. 10 (citing *California v. Texas*, 141 S. Ct. 2104 (2021)). The Carry Ban

---

[4] The Attorney General's office has acknowledged it is on notice of our challenge. Indeed, it has filed a brief defending the Carry Ban and moving for summary judgment on behalf of Director McCraw.

has two parts: "The criminal provision forbids [Plaintiffs] from carrying a handgun altogether. The licensing program declines to grant their age group, specifically, a limited exception in the form of a concealed handgun license." *McCraw*, 719 F.3d at 345. While the licensing program is solely administered by the Director, the criminal provision is enforced by all Defendants, each of whom must be enjoined to afford Plaintiffs full relief if the State is not enjoined to issue them licenses. Glaser and Smith are (like Forrest), therefore, proper parties to the case.

Next, Glaser and Smith argue that attorneys' fees under 42 U.S.C. § 1988 are inappropriate because sovereign immunity protects governmental entities from money damages. *See* Smith Br. 16; Glaser Br. 12. As discussed above, attorneys' fees are not money damages barred by sovereign immunity, but a component of the prospective relief Plaintiffs may seek despite Texas's sovereign immunity. *See Jenkins*, 491 U.S. at 278. Glaser and Smith also argue that Plaintiffs may not maintain a Section 1983 suit while also relying on *Ex parte Young*. *See* Smith Br. 15, Glaser Br. 11. It is unclear what basis they have for asserting the incompatibility of *Young* and Section 1983, but no such rule exists. The Fifth Circuit has frequently found sovereign immunity inapplicable under *Young* in the Section 1983 context. *See, e.g.*, *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). Although the Supreme Court has said that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983," (which might be the source of Smith and Glaser's argument) that limitation on Section 1983 is not applicable in *Young* suits, where "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989) (citing *Ex parte Young*, 209 U.S. at 159–60). Sovereign immunity imposes no bar to any element of Plaintiffs' claims for attorneys' fees against Glaser and Smith.

24

Qualified and prosecutorial immunities fare no better. *See* Smith Br. 24; Glaser Br. 19–20. Neither is available against an official capacity claim, *see Sanders-Burns v. City of Plano*, 594 F.3d 366, 371 (5th Cir. 2010); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 467 (5th Cir. 1999), and Plaintiffs have only pleaded official capacity claims against Defendants, *see* Compl., Doc. 1, ¶¶ 23–26 (Nov. 9, 2021).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions for summary judgment as to the as-applied claim and grant Plaintiffs' cross-motion for summary judgment.

Dated: March 18, 2022

R. Brent Cooper
Texas Bar No. 04783250
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

Respectfully submitted,

*/s/ David H. Thompson*
David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
*Admitted pro hac vice

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

*/s/ David H. Thompson*
David H. Thompson