**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| AIDAN ANDREWS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 4:21-cv-01245-P |
| | ) |
| STEVEN MCCRAW, et al., | )   District Judge Mark T. Pittman |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

<u>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF SUMMARY JUDGMENT**</u>

In *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. ---, No. 20-843, 2022 WL 2251305 (Sup. Ct.), the Supreme Court fundamentally altered the way that courts in this circuit (indeed, courts in almost every circuit) must assess the constitutionality of laws that impact the right to keep and to carry arms. In so doing, it cleared the way for this Court to grant summary judgment in Plaintiffs' favor on their facial challenge to Texas's restrictions on handgun carriage by adults 18-to-20-years-old ("the Carry Ban"). Where previously Fifth Circuit precedent foreclosed Plaintiffs' facial challenge, that precedent has been abrogated and this Court is free to consider this case as a matter of first impression under the new analysis. Plaintiffs' supplemental submission examining these issues through the lens provided by *Bruen* should look familiar to the Court, because Plaintiffs covered these issues in their previous briefing. The new standard announced by the Supreme Court is exactly the text, history, and tradition-based standard that Plaintiffs have been arguing in favor of all along, and, as Plaintiffs have explained (and will demonstrate again here), under that standard the Carry Ban must be declared unconstitutional as inconsistent with the Amendment's text and our nation's history of firearms regulation.

1

I.    **No Fifth Circuit Case Forecloses Plaintiffs' Facial Challenge to Texas's Carry Ban.**

Plaintiffs' have moved for summary judgment on all claims, including their facial challenge, although we noted in our motion that "the Court is bound by circuit precedent to deny Plaintiffs' motion with respect to" the facial challenge. Pls.' Mot. for Summ. J., Doc. 57 at 1 (Mar. 18, 2022). Plaintiffs acknowledged the same thing in their complaint. Compl., Doc. 1 at ¶ 19 (Nov. 9, 2021) ("To be sure, Plaintiffs acknowledge that their facial challenge to Texas's ban on public carry by 18-to-20-year-olds is foreclosed in this Court by *National Rifle Association of America v. McCraw*, 719 F.3d 338 (5th Cir. 2013) [("*McCraw*")], but they believe the case was wrongly decided."). The Supreme Court, in *Bruen*, abrogated *McCraw* as well as its predecessor case, on which Defendants also rely, *National Rifle Association of America, Inc. v. BATFE*, 700 F.3d 185, 191–92 (5th Cir. 2012) ("*NRA I*"), and so they are no longer binding precedent in this Court, *see Vestas-Am. Wind Tech., Inc. v. Salazar*, No. 6:19-CV-076, 2021 WL 1398972, at *2 (N.D. Tex. Mar. 12, 2021).

Both *NRA I* and *McCraw* applied the Fifth Circuit's two-step test for analyzing the constitutionality of laws challenged under the Second Amendment in which "the first step is to determine whether . . . the [challenged] law regulates conduct that falls within the scope of the Second Amendment's guarantee" and "the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *NRA I*, 700 F.3d at 194. As Plaintiffs have explained in their earlier briefing, *see* Pls.' Br. in Support of Mot. for Summ. J., Doc. 58 at 10–11 (Mar. 18, 2022) ("Pls.' Br."); Pls.' Reply in Support of Summ. J., Doc. 65 at 2–4 (Apr. 29, 2022) ("Pls.' Reply"), in both cases the Fifth Circuit explicitly declined to rest their holding on the first step of that analysis. In *NRA I* the court said that although it was "inclined to uphold the challenged federal laws at step one of [its] analytical framework" it "ultimately conclude[d] that the challenged federal laws pass

constitutional muster *even if* they implicate the Second Amendment guarantee." 700 F.3d at 204 (emphasis added); *see also McCraw*, 719 F.3d at 347 ("[U]nder circuit precedent [*NRA I*], we conclude that the conduct burdened by the Texas scheme *likely* 'falls outside the Second Amendment's protection.' " (emphasis added)). As such, the Fifth Circuit's analysis of the former "step-one" issue is not binding on this Court, which remains free to determine for itself whether laws restricting the rights of 18-to-20-year-olds to carry handguns for the purpose of self-defense implicates the Second Amendment right. *See* Pls.' Reply at 3–4.

The only binding portion of the *NRA I* and *McCraw* opinions was the step-two analysis, but that can no longer control because the Supreme Court has made clear that the two-step approach to Second Amendment cases was "one step too many" and "inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Bruen*, slip op. at 10. Instead, following *Bruen*, the standard for assessing Second Amendment challenges is this: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 15. This is precisely the standard for which Plaintiffs have argued since the beginning of this case. *See* Pls.' Br. at 7–8. Neither *NRA I* nor *McCraw* answer the questions that under *Bruen* are dispositive for Texas's Carry Ban and so neither controls the outcome of this litigation. The Court is free to decide (and should hold) that Texas's Carry Ban is facially unconstitutional under the Second Amendment.

## II.    Texas's Carry Ban Must Be Invalidated Under *Bruen*'s Text and History Test.

*Bruen* definitively established "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." Slip op. at 1. Therefore, the only question for the Court to decide is whether the fact that Plaintiffs are between 18 and 21 years old removes them from the scope of the right. Under *Bruen*, that is a textual question in the

3

first instance, and here two key elements of the Amendments' text plainly bring 18-to-20-year-olds within its scope. *See Bruen*, slip op. at 10; *see also* Pls.' Br. at 9–10. First, the Amendment refers to the right of "the people" to keep and bear arms, without mentioning age. The "people" according to its " 'normal and ordinary' meaning," includes all ordinary, law-abiding Americans. *See Bruen*, slip op. at 1, 11. Other constitutional amendments reinforce this reading: As Plaintiffs have explained, "the people" only appears in two other amendments—the First and Fourth, *see District of Columbia v. Heller*, 554 U.S. 570, 579 (2008)—and both of them apply to people regardless of age. *Hirschfeld v. BATFE*, 5 F.4th 407, 421 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322, 328 (4th Cir. 2021). And even where "the people" does not appear, *every other constitutional right* applies *at least* to those 18 and older. *Id.* at 422–23.

The second textual clue that indicates 18-to-20-year-olds are included within the scope of the Amendment is the "prefatory clause," which prefaces the substance of the amendment by stating "[a] well regulated Militia, being necessary to the security of a free State. . . ." As *Heller* explained, this clause "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 595, 599. As such, although the right is not limited to those who are in the militia or eligible for militia service, "[l]ogic demands that there be a link between the stated purpose and the command," *id.* at 577, meaning that if an individual was a member of the "militia," at least his rights must be protected by the Amendment. At the Founding the "militia" was widely understood to refer to the collection of "all able-bodied men," *id.* at 596, including, in the unanimous judgment of the federal government and every state in the union, all men of at least 18 years of age, *National Rifle Association of America, Inc. v. BATFE*, 714 F.3d 334, 339 (5th Cir. 2013) (Jones, J., dissental) ("*NRA II*"). The Militia Act, Act of May 8, 1792, ch. 33 § 1, 1 Stat. 271, 271, passed by the First Congress just months after the Second Amendment was ratified

4

"commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones v. Bonta*, 34 F.4th 704, 719 (9th Cir. 2022) (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (alterations omitted)). As a result, Judge Jones noted in *NRA II*, "any argument that 18-to-20-year olds were not considered, at the time of the founding, to have full rights regarding firearms" is "inconceivable." *NRA II*, 714 F.3d at 342 (Jones, J., dissental). The text of the Amendment cannot be read any other way.

Texas nevertheless denies 18-to-20-year-olds the right to carry firearms for self-defense. Under the reading above, Texas's law must be declared unconstitutional and its enforcement enjoined unless the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, slip op. at 15. The Supreme Court was clear: the burden is on the government to *prove* that its law is constitutional, and the only acceptable standard against which to judge it is the history of traditional firearm regulation in this country. *Id.*; *see also id.* at slip op. at 17 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.").

Defendants offer a few potential historical justifications for the Carry Ban, but they cannot satisfy this burden. First, the State argues that "a tradition of disarming and restricting firearms sales—particularly for public safety reasons—predates the Revolution." Def. McCraw's Br. in Supp. of Summ J., Doc. 46 at 8–9 (Feb. 18, 2022) (citing *NRA I*, 700 F.3d at 200) ("State Br."). That tradition should be seen to extend, Defendant argues, to 18-to-20-year-olds because they were "minors" at the Founding. But that is a non sequitur; that there was some undefined "tradition" of firearms regulations and that Plaintiffs would have been considered "minors" in 1791 does not

5

mean those regulations would have extended to them because of that status. *Bruen* makes clear that the inquiry must be more specific than this. Noting that "everything is similar in infinite ways to everything else, one needs some metric enabling the analogizer to assess which similarities are important and which are not," the Court put forward two key metrics for this Court to use in evaluating the State's justifications: "how and why" did the earlier "regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, slip op. at 20 (cleaned up). Following from that, this Court must ask: Do "modern and historical regulations impose a comparable burden on the right of armed self-defense and [is] that burden . . . comparably justified[?]" *Id.* The State's argument based on the minority status of 18-to-20-year-olds at the Founding fails this test two different ways. First, as Judge Jones explained, minority status for 18-to-20-year-olds at the founding was not accompanied by restrictions on keeping or carrying arms. It may have restricted 18-to-20-year-olds in other ways in 1791, *see Jones*, 34 F.4th at 720, but "those minors were in the militia *and, as such*, they were required to own their own weapons. What is *inconceivable* is any argument that 18-to-20-year olds were not considered, at the time of the founding, to have full rights regarding firearms." *NRA II*, 714 F.3d at 342 (Jones, J., dissental). Second, even if the State could show that being a minor in 1791 carried with it some disability with respect to firearms, *Bruen* also demands that modern restrictions be "comparably justified" to their historical analogues. And here, there would be no justification for extending any historical restrictions based on minority status to 18-to-20-year-olds today, since 18-to-20-year-olds today are legally adults, not minors.

Second, the State argues that "by the end of the 19th century, 19 (of the then 45 states), and the District of Columbia, had laws restricting the purchase or use of firearms for Under-21s" and that three more states joined them by 1923. State Br. at 9 (citing *NRA I*, 700 F.3d at 202). But this

argument is pitched at too high a level of generality to satisfy the *Bruen* standard. For one thing, "how" the historical restrictions limited 18-to-20-year-olds' exercise of their Second Amendment rights is a "central consideration[] when engaging in an analogical inquiry," *Bruen*, slip op. at 20 (cleaned up), and the State has not shown that 22 states had bans on carriage of firearms by 18-to-20-year-olds in 1923, only that they had laws imposing restrictions generally on "the purchase or use of firearms for Under-21s." State Br. at 9; *see also Bruen*, slip op. at 21 ("[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted.") (citation and quotation marks omitted). Furthermore, history from the late 19th and early 20th centuries is far too late in time to establish that the Second Amendment, which by its plain text applies equally to 18-to-20-year-olds, does not mean what it says. "[T]o the extent later history contradicts what the text says, the text controls," and this Court must "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, slip op. at 26–27.

> *Bruen* makes it clear that not all historical evidence is equally valuable. The most important historical period for interpreting the Second Amendment is the time immediately before and after its ratification in 1791. Although the Second Amendment became applicable against the states in 1868 through the addition of the Fourteenth Amendment, the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* at 28; *see also Malloy v. Hogan*, 378 U.S. 1, 10 (1964) (collecting cases). The Supreme Court in *Bruen*, left open the question of whether that meant the 1791 or 1868 understanding of the amendment controlled, but it noted it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, slip

7

op. 28–29; *see also Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (noting that the relevant inquiry is "the public understanding in 1791 of the right codified by the Second Amendment").

While the Court in *Bruen* acknowledged an "ongoing scholarly debate" over whether the ratification of the Fourteenth Amendment imbued the Second Amendment with a new and different meaning in 1868 than it had in 1791, the Court indicated that it did not view things that way, explaining that "post-Civil war discussions of the right to keep and bear arms [which] 'took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.' " Slip op. at 28 (quoting *Heller*, 554 U.S. at 614); *see also id.* at 2 ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of rights.") (Barret, J., concurring).

Here, as in *Bruen*, the relative importance of evidence from 1868 and 1791 is not of great significance, since the unanimous practice from the Founding of permitting 18-to-20-year-olds to exercise their Second Amendment rights on equal footing with other adults was still the overwhelming majority practice in the states in 1868. *See NRA I*, 700 F.3d at 203 (providing just two examples of states upholding restrictions on sales of firearms to minors from 1858 and 1878 respectively). Either way, the late-19th and early-20th century evidence of restrictions on which the State relies is the least valuable period for assessing the meaning of the Second Amendment right. In *Bruen*, the Court noted that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence," and it declined to even address evidence from the 20th-century because it provided no insight into the question.

*Bruen*, slip op. at 58 & n.8; *see also Jones*, 34 F.4th at 722 (rejecting reliance on 19th and 20th century analogues).

Far from supporting the State's argument that 18-to-20-year-olds fall outside the scope of the Amendment, history demonstrates just the opposite. As the Ninth Circuit recently explained, surveying the history of 18-to-20-year-old arms bearing in *Jones*, "[t]he tradition of young adults keeping and bearing arms is deep-rooted in English law and custom" and "was brought across the Atlantic by the American colonists." 34 F.4th at 717. In addition to "the founding-era evidence of militia membership [which] undermines Defendants' interpretation" of the Amendment, young adults were expected to bear arms as part of the practice of *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Id.* at 718, 722.

Lacking the support of either the text of the Amendment or historical practice, Defendants have one last argument that the Carry Ban is constitutional. The State claims that because the Carry Ban only covers "carrying handguns outside the home or vehicle, for a limited period, and with exceptions for current or past, honorable military service, and for those with a particularized need for protection evidenced by a protective order," they do not burden Second Amendment protected conduct. State Br. at 12. *Bruen* forecloses this argument too. As discussed above, "carrying handguns outside the home" is Second Amendment protected conduct under *Bruen*. Slip op. at 1. Furthermore, it is a right that must be exercisable by any "ordinary, law-abiding citizen[]." *Id.* That means exceptions for individuals who have joined the military, or who have demonstrated a special need for protection, do not bring Texas's law into compliance with the Amendment's requirements. *See Bruen*, slip op. 2 ("Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude the State's

licensing regime violates the Constitution."). Finally, that the State's violation of the Second Amendment will only impact an individual for "a limited period"—three full years—does not make it less of a violation. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). *Bruen* takes courts out of the business of judging whether the extent or severity of a Constitutional violation is sufficient to warrant declaratory or injunctive relief. *See Bruen*, slip op. at 9–10. That Plaintiffs will eventually age-out of the Carry Ban cannot shield Defendants in this case.

The State has failed to carry its burden to show that its Carry Ban is constitutional, and this Court should grant summary judgment to Plaintiffs on their facial challenge to the law.

Dated: July 8, 2022

R. Brent Cooper
Texas Bar No. 04783250
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

Respectfully submitted,

*/s/ David H. Thompson*
David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
*Admitted pro hac vice

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

*/s/ David H. Thompson*
David H. Thompson
