IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| AIDAN ANDREWS, JORDYN BLAKEY, and | § | |
| FIREARMS POLICY COALITION, INC., | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-1245 |
| | § | |
| STEVEN MCCRAW, *et al.*, | § | |
| *Defendants*, | § | |

## DEFENDANT STEVEN MCCRAW'S
## SUPPLEMENTAL BRIEF

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant
Attorney General

SHAWN E. COWLES
Deputy Attorney General for
Civil Litigation

CHRISTOPHER D. HILTON
Chief, General Litigation Division

RYAN G. KERCHER
Texas Bar No. 24060998
Southern Dist. Bar No. 882329
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
Phone: (512) 463-2120
Fax: (512) 320-0667
Email:Ryan.Kercher@oag.texas.gov

**COUNSEL FOR DEFENDANT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ----------------------------------------------------------------- ii

TABLE OF AUTHORITIES -------------------------------------------------------------iv

DEFENDANT STEVEN McCRAW'S SUPPLEMENTAL BRIEF --------------------1

I.    INTRODUCTION-----------------------------------------------------------------1

II.   *BRUEN*-----------------------------------------------------------------------------1

    A.    The Facts of *Bruen* ----------------------------------------------------2

    B.    *Bruen*'s Holding----------------------------------------------------------3

        1.    *Trimming Two Steps Down to One*-----------------------------3

        2.    *Evaluating Historical Analogous Regulations*-----------------4

        3.    *Rejection of New York's "May-Issue" Licensure Regime*--------5

    C.    *Bruen* Moots Some Arguments in This Case ------------------------ 5

III.    ARGUMENT ------------------------------------------------------------------ 6

    A.    Unlike New York in *Bruen,* Texas is a "Shall-Issue" State ---------------- 6

    B.    The *BATF* and *McCraw I* Historical Analysis Remain Binding Law------------ 8

    C.    The *BATF* and *McCraw I* Historical Analysis is Thorough and Compelling--10

        1.    *The BATF Historical Analysis*-----------------------------------------10

        2.    *The* McCraw I *Historical Analysis* ----------------------------- 13

    D.    Plaintiffs' Own Historical Examples Are Unavailing------------------------- 13

        1.    *Plaintiffs' Historical Analysis* -----------------------------------------14

        2.    *Plaintiffs' Analysis of Their Own Historical Examples Does Not Comport with* Bruen----------------------------------------------------- 15

    *3.*  *Plaintiffs' Insistence on Identical Modern and Historical Regulations Is Nonsensical*------------------------------------------------------------------------ 16

    *4.*  *Plaintiffs' Historical Examples Help McCraw's Case* ------------------------- 17

    *5.*  *McCraw's Position Entails None of the Absurdities Produced by Plaintiffs' Analysis* ------------------------------------------------------------------- 20

  E.  Plaintiffs' As-Applied-To-Women Claim is Dead -----------------------------------20

    *1.*  *Plaintiffs Offer No Historical Basis for Their As-Applied-To-Women Claim* ----------------------------------------------------- 21

    *2.*  *Plaintiffs' Pleadings Show Their  As-Applied-To-Women Claim Arose Exclusively Under the Now-Abrogated Second Step* ---------------------------- 21

    *3.*  BATF's *and* McCraw I's *Historical Analysis Precludes Plaintiffs' As-Applied-To-Women Claim Under Step I*------------------------------------------23

CONCLUSION  ------------------------------------------------------------------------------------24

CERTIFICATE OF SERVICE-----------------------------------------------------------------------------25

# TABLE OF AUTHORITIES

**Cases**

*Buckley v. American Const. Law Found., Inc.*, 525 U.S. 182 (1999)......................... 20

*Coleman v. State*, 32 Ala. 581 (1858) ........................................................................... 12

*Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460 (5th Cir. 2013)................................... 14

*Craig v. Boren*, 429 U.S. 190 (1976).............................................................................. 5

*District of Columbia v. Heller*,554 U.S. 570 (2008) ......................................... 2, 12, 17

*Hirschfeld v. Bur. of Alcohol, Tobacco, Firearms, and Explosives*,
 5 F.4th 407 (4th Cir. 2021)........................................................................ 9, 10, 13, 14

*In re Klenosky*, 75 App.Div.2d 793, (1980) ................................................................... 2

*Jarkesy v. Sec. and Exch. Comm'n*,
 No. 20-61008, 2022 WL 1563613, at *8 n.9 (5th Cir. May 18, 2022) ...................... 9

*McDonald v. Chicago*, 561 U.S. 742 (2010) .................................................................. 2

*Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, and Explosives*,
 714 F.3d 334, 342 (5th Cir. 2013) ........................................................................ 9, 14

*Nat'l Rifle Assoc. of America, Inc. v. Bur. of Alcohol, Tobacco, Firearms, and
 Explosives.*, 700 F.3d 185, 194 (5th Cir. 2012)..................................................... 3, 8

*Nat'l Rifle Assoc. of America, Inc. v. McCraw*,
 718 F.3d 338 (5th Cir. 2017) ........................................................................... 3, 8, 9

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*,
 597 U.S. ---, 2022 WL 2251305 (June 23, 2022)........................................... passim

*Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 n.10 (4th Cir. 1993) .... 10

*Ridley v. McCall*, 496 F.2d 213 (5th Cir. 1974) ......................................................... 14

*State v. Allen*, 94 Ind. 441 (1884) ................................................................................ 11

*State v. Callicutt*, 69 Tenn. 714 (1878)........................................................................ 12

iv

*State v. Quail*, 92 A. 859 (Del. 1914) .......................................................................... 11

*Tankersly v. Commonwealth*, 9 S.W. 702, 702 (Ky. 1888) .......................................... 11

*Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015) ................................. 9

*U.S. v. Miller*, 307 U.S. 174 (1939) ............................................................................. 17

*United States v. Emerson*, 279 F.3d 203 (5th Cir. 2001) ............................................ 11

*United States v. Potts*, 644 F.3d 233 (5th Cir. 2011) ................................................... 9

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) ................................................... 11


**Statutes**
Tᴇx. Gᴏᴠᴛ. Cᴏᴅᴇ § 411.172 .......................................................................................... 7
Tᴇx. Gᴏᴠᴛ. Cᴏᴅᴇ § 411.172(i) ..................................................................................... 7
Tᴇx. Gᴏᴠᴛ Cᴏᴅᴇ  § 411.172(g)(1)-(2) ............................................................... 14, 15, 19
Tᴇx. Gᴏᴠᴛ Cᴏᴅᴇ  § 411.174(g)(1)-(2) ...................................................................... 14
Tᴇx. Gᴏᴠᴛ. Cᴏᴅᴇ § 411.177 ................................................................................. 6, 7, 8
Tᴇx. Gᴏᴠᴛ. Cᴏᴅᴇ § 411.177 (West Cum. Supp. 2021) ................................................ 3


**Other Authorities**

Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271 ................................................. passim

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (2011)9

J.P. Chamberlain, *Legislatures and the Pistol Problem*, 11 A.B.A. J. 956 (1925) ..... 10

John Edward Murray Jr., *Murray on Contracts*, § 12, at 18 (2d ed. 1974) .............. 10

John Indermaur, *Principles of Common Law* 195
    (Edmund H. Bennett ed., 1st Am. Ed. 1878) ......................................................... 10

Larry D. Barnett, *The Roots of Law*,
    15 Am. U.J. Gender Soc. Pol'y & L. 613, 681-86 (2007) ....................................... 10

N.Y. Penal Law Ann. § 400.00(2)(f) .............................................................................. 2

N.Y. Penal Law Ann.
§§ 265.01-b (West 2017, 261.01(1) (West Cum. Supp. 2022), 70.00(2)(e) and (3)(b),
80.00(1)(a) (West 2021), 70.15(1), 80.05(1)...............................................................2

N.Y. Penal Law Ann. §§ 400.00(1)(a)-(n) (West Cum. Supp. 2022) ............................2

R. Bork, The Tempting of America: The Political Seduction of the Law 169 (1990)  19

Saul Cornell & Nathan DeDino,
*A Well Regulated Right: The Early American Origins of Gun Control,*
73 Fordham L.Rev. 487, 502-13 (2004) ....................................................................9

*Second Amendment Limitations and Criminological Considerations,*
60 Hasting L.J. 1339, 1359-60 (2009)........................................................................9

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883).........10, 11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| AIDAN ANDREWS, JORDYN BLAKEY, and | § | |
| FIREARMS POLICY COALITION, INC., | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-cv-1245 |
| | § | |
| STEVEN MCCRAW, *et al.*, | § | |
| *Defendants*, | § | |

**DEFENDANT STEVEN MCCRAW'S**
**SUPPLEMENTAL BRIEF**

TO THE HONORABLE MARK T. PITTMAN, U.S. DISTRICT JUDGE:

In compliance with the Court's June 23, 2022 order, Defendants file this Supplemental Brief. In support, Defendants would respectfully show:

## I.    INTRODUCTION

*Bruen* shortens the analysis in this case, but does not alter its outcome. *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. ---, 2022 WL 2251305 (June 23, 2022). The Challenged Provisions are historically analogous to the longstanding tradition of age-based firearms regulations for under-21-year-olds, and are therefore constitutional. Although *Bruen* simplifies the Second Amendment legal framework, Plaintiffs' claims still fail.

## II.    *BRUEN*

Where *Heller* and *McDonald* recognized the Second and Fourteenth Amendment right of ordinary, law-abiding citizens to possess handguns for self-defense in the home, *Bruen* recognizes the right of ordinary, law-abiding citizens to possess handguns for self-defense in public. *New York State Rifle & Pistol Assoc., Inc.*

*v. Bruen* at *5 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)). In doing so, the Court rejected the second part of a widely-adopted two- step Second Amendment test. Now, courts need only undertake an analysis of historical analogues to challenged firearm regulations to determine whether the regulations are "consistent with the Nation's historical tradition of firearm regulation." *Bruen* at *11.

## A. The Facts of *Bruen*

New York firearm restrictions criminalized possession of any firearm without a license, whether inside or outside the home. *Bruen* at *5 (citing N.Y. Penal Law Ann. §§ 265.01-b (West 2017, 261.01(1) (West Cum. Supp. 2022), 70.00(2)(e) and (3)(b), 80.00(1)(a) (West 2021), 70.15(1), 80.05(1)). For an applicant to legally possess a firearm in his own home, New York required him to convince a licensing officer that he was of good moral character, had no history of crime or mental illness, and that "no good cause exists for the denial of the license." *Id*. at *6 (citing N.Y. Penal Law Ann. §§ 400.00(1)(a)-(n) (West Cum. Supp. 2022)). To obtain a license to carry a handgun outside the home, New York required the applicant to prove "proper causes exist[ed]" for issuance of the license. *Id*. (citing N.Y. Penal Law Ann. § 400.00(2)(f). "Proper cause" was undefined by New York's statute, but courts held that "proper cause" required the applicant to demonstrate a "special need for self-protection distinguishable from that of the general community." *Id*. (citing *In re Klenosky*, 75 App.Div.2d 793, (1980)).

2

**B. *Bruen*'s Holding**

Justice Thomas, writing for the majority, distinguishes the New York provisions from other states' handgun licensure schemes, noting that 43 states regulate the public carrying of handguns using licensure regimes based on objective criteria. *Bruen*, at *6, n.1 (citing, *inter alia*, TEX. GOVT. CODE § 411.177 (West Cum. Supp. 2021)). The Court then turns to the issue of how to evaluate the constitutionality of regulations affecting this important right. *Id.*

*1. Trimming Two Steps Down to One*

*Bruen* trims the two-step Second Amendment analysis adopted by several circuits, including the Fifth Circuit. *Id.* at *7-8, 9, 11. The Fifth Circuit first announced its version of this two-step test in *Nat'l Rifle Assoc. of America, Inc. v. Bur. of Alcohol, Tobacco, Firearms, and Explosives*. 700 F.3d 185, 194 (5th Cir. 2012) ("*BATF*"). Five years later, another Fifth Circuit panel followed suit. *Nat'l Rifle Assoc. of America, Inc. v. McCraw*, 718 F.3d 338, 347 (5th Cir. 2017) ("*McCraw I*").[1]

The first step of this test ("First Step") evaluates whether the challenged regulation is consistent with "this Nation's historical tradition." *Bruen* at *8; *see also BATF*, 700 F.3d at 203 ("consistent with longstanding, historical tradition") and *McCraw I*, 719 F.3d at 347. The second step ("Second Step") determined which means-end scrutiny to apply, and undertook that balancing test. *Bruen* at *8; *BATF*, 700 F.3d at 195; *McCraw I*, 719 F.3d at 347.

*Bruen* leaves the First Step of this test intact, but rejects the Second Step.

---

[1] Plaintiffs refer to *BATF* as "*NRA I*," and to *McCraw I* as "*McCraw*."

*Bruen* at *7-8, 9, 11. Conducting an analysis of historically analogous law compared to regulations challenged under the Second Amendment (formerly Step One) is now the test required for Second Amendment challenges.

### 2. *Evaluating Historically Analogous Regulations*

The Court next elaborates on criteria for conducting the requisite historical analysis, and how closely a challenged regulation must resemble historical analogues in order to be "consistent." *Bruen* at *12. Importantly, challenged regulations need not have a "historical *twin*[]" or be a "dead ringer for historical precursors" in order to pass this test: courts can use analogies to historical regulations to determine whether modern regulations prohibiting carrying firearms are constitutionally permissible. *Id.* at *13 (emphasis original).

The analysis by analogy may be straightforward, as "when a challenged regulation addresses a general societal problem that has persisted since the 18th century." *Id.* at *12. The challenged regulation need only be "distinctly similar" to historical regulation, and cannot use "materially different means" to address a societal problem. *Id.* at *12-13. The challenged provision need only be analogous to historical regulations, and need only be "relevantly similar." *Id.* at *13.

One relevant consideration in evaluating whether challenged and historical regulations are analogous or "relevantly similar," is whether they both affect a "central" component of the Second Amendment bundle of rights, such as "the law-abiding citizen's right to armed self-defense." *Id.* at *12 For example, a modern regulation need not regulate *exactly* the "sensitive place" found in historical

4

regulations, but must simply be analogous to such historical regulations. *Id*. at *14. The analysis should evaluate "how and why the regulations burden a law-abiding citizen's right to armed defense." *Id*. at *13. Whether the challenged regulation and putative historical analogue impose a comparable burden on Second Amendment rights that is comparably justified is a central consideration when engaging in the *Bruen* test. *Id*. at *13.

### 3. *Rejection of New York's "May-Issue" Licensure Regime*

*Bruen* undertakes its own historical analysis of discretionary firearms licensure based on a showing of a specific need to keep or bear arms. *Id*. at *14. Finding no historical analogue, the Court squarely rejects the New York provisions' "proper cause" requirement, and holds that the right to bear commonly used arms in public is subject only to certain reasonable, well-defined restrictions. *Id*. at *33.

### C. *Bruen* **Moots Some Arguments in This Case**

Because *Bruen* has truncated the Second Amendment analysis, portions of the Parties' analysis are now moot. The Parties' discussion of the Second Step analysis is now moot, except insofar as those discussions refer to the First Step. The Parties' discussion of which level of scrutiny to apply is moot. Likewise, the Parties' application of intermediate scrutiny is moot. This discussion includes: statistical analyses showing gender-based proclivities towards violence among young people; whether Plaintiffs' claim is a disparate impact or Equal Protection claim in disguise; and the relevance or bindingness of *Craig v. Boren*, 429 U.S. 190 (1976). Instead, the Court need only apply the historical analogy standard described in *Bruen*.

### III.   ARGUMENT

While the adoption of a one-step Second Amendment test presents an important change to the Fifth Circuit's Second Amendment jurisprudence, and excises many of the Parties' arguments, *Bruen* does not alter the outcome of this case. Plaintiffs' claims still fail.

Under the *Bruen* standard, Plaintiffs' claims fail because: (A) unlike New York in *Bruen*, Texas is one of 43 states offering "shall issue" handgun licenses based on objective criteria; (B) the *BATF* and *McCraw I* holdings that the Challenged Provisions pass the First Step remain binding; (C) the *BATF* and *McCraw I* historical analysis is thorough and compelling; (D) Plaintiffs' historical examples are unavailing; and (E) *Bruen* eviscerates Plaintiffs' as-applied-to-women claim.

### A. Unlike New York in *Bruen*, Texas is a "Shall-Issue" State

As an initial matter, the Court should note that *Bruen* did not address a shall-issue firearms licensure statute like the regulatory framework used in Texas. As Justice Kavanaugh's concurrence points out, the distinction matters. *Id.* at *38 (Kavanaugh, J., concurring). *Bruen* "does not affect the existing licensing regimes—known as "shall issue" regimes-that are employed in 43 states." *Id.*; *cf. id.* at *6 (citing Tex. Govt. Code § § 411.177). Justice Kavanaugh continues,

> [a]s the Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorized licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense....

*Id.* at *38 (Kavanaugh, J., concurring).

6

In contrast, Texas is a "shall issue" state. *Id*. at *6 (citing TEX. GOVT. CODE §
411.177). Unlike the unfettered discretion offered under the New York framework at
issue in *Bruen*, Texas uses objective criteria—including, in some cases, age—to
evaluate eligibility for licensure. *See*, *e.g.*, TEX. GOVT. CODE § 411.172. *Bruen*
therefore evaluates a fundamentally different licensing scheme than the one at issue
in this case.

Despite this clear distinction, Plaintiffs attempt to conflate the Texas and New
York statutes. Dkt. 71, p. 9. Plaintiffs compare New York's "proper cause"
discretionary standard for showing a particularized need for a firearms license with
Texas' objective criterion of showing the emplacement of a protective order. *Id*.; *see
Bruen* at *6; TEX. GOVT. CODE §411.172(i). The New York statute in *Bruen* required
an applicant to show "proper cause," and left the adjudicate of such a request to the
discretion of a hearing officer. *Bruen* at *6. In contrast, Texas' protective order
exception provides an objective criterion safely removed from "arbitrary and
capricious" adjudications by bureaucrats imbued with boundless discretion. *Id*. at *6.

*Bruen* itself recognizes the distinction between New York's subjective and
discretionary standard, and the objective standards used in the Texas regime—and
the regimes of at least 42 other states. *Id*. (New York is not alone in requiring a permit
to carry a handgun in public. But the cast majority of States—43 by our count—are
'shall issue' jurisdictions, where authorities must issue concealed-carry licenses
whenever applicants satisfy certain threshold requirements, without granting
licensing officials discretion to deny licenses based on a perceived lack of need or

suitability.") (citing, *inter alia*, Tex. Govt. Code § 411.177). Justice Kavanaugh's concurrence underscores the importance of the distinction drawn in the majority opinion. *Id.* at *38 (Kavanaugh, J., concurring) (*First*, the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. In particular, the Court's decision does not affect the existing licensing regimes—known as "shall-issue" regimes—that are employed in 43 States. The Court's decision addresses only the unusual discretionary licensing regimes, know as "may-issue" regimes, that are employed by 6 States including New York.") (Emphasis original).

*Bruen* has therefore already explicitly reject the very argument Plaintiffs attempt in their supplemental brief.

## B. The *BATF* and *McCraw I* Historical Analysis Remain Binding Law

Among the arguments the Court must still address is the precedential value of *BATF* and *McCraw I* regarding the First Step analysis. While the Second Step analysis in those cases is now abrogated, the First Step analysis, which analyzes historically analogous firearms regulations, remains good law. *BATF* and *McCraw I* remain binding as to their holdings regarding the First Step, which now constitutes the only step in Second Amendment analysis. Even if the Court disagrees that the holdings remain binding authority, *BATF* and *McCraw I* remain more persuasive authority on the constitutionality of age-based firearms regulations than any of Plaintiffs' proffered authority.

Both *BATF* and *McCraw I* undertake the First Step analysis. *BATF*, 700 F.3d at 194-95; *McCraw I*, 719 F.3d at 346-47. Both *BATF* and *McCraw I* upheld statutory

schemes under the First Step analysis, and proceeded to the Second Step, "in an abundance of caution." *BATF*, 700 F.3d at 204; *McCraw I*, 719 F.3d at 347. Plaintiffs contend the *BATF* and *McCraw I* First Step analyses are *dicta*. Dkt. 58, pp. 10-11; Dkt. 69. McCraw disagrees. Dkt. 64, pp. 2-3; Dkt. 68 (citing *Jarkesy v. Sec. and Exch. Comm'n*, No. 20-61008, 2022 WL 1563613, at *8 n.9 (5th Cir. May 18, 2022) (citing *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015) (quoting *United States v. Potts*, 644 F.3d 233, 237 n.3 (5th Cir. 2011))) (noting the Fifth Circuit "rule that alternative holdings are binding precedent and not orbiter dictum"). The First Step holdings in *BATF* and *McCraw I* are alternative holdings, meaning that despite the Second Step analysis conducted in both cases, the First Step holding is binding and not *dicta. Id.*

McCraw will not undertake to re-hash this argument here. McCraw stands on his previous position, and notes for the Court that the issue has gained prominence in light of the abrogation of the other half of the analysis undertaken by both *BATF* and *McCraw I*.

Further, McCraw notes that even if the Court disagrees regarding the binding precedential effect of *BATF* and *McCraw I*, their persuasiveness is unmatched by Plaintiffs' preferred case law. *See, e.g.*, Dkt. 58, p. 14 (citing *Hirschfeld v. Bur. of Alcohol, Tobacco, Firearms, and Explosives*, 5 F.4th 407 (4th Cir. 2021) ("*Hirschfeld I*") *vacated* at 14 F.4 322 (2021) ("*Hirschfeld II*") and *Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334, 342 (5th Cir. 2013)

(*en banc*) (Jones, J., dissenting) ("*BATF II*")[2]). The analysis of two Fifth Circuit panels consisting of five separate judges trumps a single dissent and a vacated 2-1 Fourth Circuit decision "'of no precedential value'" and not even "bear[ing] the label of dicta." *Hirschfeld II*, 14 F.4 at 328 (Wynn, J., concurring in judgment) (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 n.10 (4th Cir. 1993)).

In short, this Court may rely on the sound First Step analysis conducted in *BATF* and *McCraw I*. The analysis and holding by both courts continues to foreclose Plaintiffs' facial challenges—just as it did prior to *Bruen*. Even if the Court disagrees, whether binding or persuasive, *BATF* and *McCraw I* continues to have the better argument.

### C. The *BATF* and *McCraw I* Historical Analysis is Thorough and Compelling

*Bruen*'s re-centering of historical analysis in the Second Amendment context merits revisiting the *BATF* historical analysis, which is both thorough and compelling. The *McCraw I* analysis follows suit, but includes an important clarification.

#### 1. The BATF *Historical Analysis*

*BATF* begins its analysis by noting that "when the fledgling republic adopted the Second Amendment," it did so with the understanding that it could regulate weapons on certain occasions, and in certain places, and that it could disarm certain groups. *BATF*, 700 F.3d at 200 (citing Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 1130118 (2011); Saul Cornell & Nathan DeDino, *A*

---

[2] Plaintiffs refer to *BATF II as "NRA II."*

*Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 502-13 (2004)). The Court goes on to note that the Founders would likely have supported disarming criminals, children, or the mentally imbalanced. *Id.* at 201 (citing Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hasting L.J. 1339, 1359-60 (2009); *United States v. Emerson*, 279 F.3d 203, 261 (5th Cir. 2001) (inferring from scholarly sources that "it is clear that felons, *infants*, and those of unsound mind may be prohibited from possessing firearms" (emphasis original to *BATF*)).

*BAFT* next observes that the terms "minor" and "infant" applied to persons under the age of 21, not only to person under the age of 18. *Id.*  For this proposition, the Fifth Circuit cites sources ranging from the Common Law, to Black's Law Dictionary, and scholarly sources from the 19th and 20th century. *Id.* (citing *Black's Law Dictionary* 847 (9th ed. 2009), John Indermaur, *Principles of Common Law* 195 (Edmund H. Bennett ed., 1st Am. Ed. 1878); John Edward Murray Jr., *Murray on Contracts*, § 12, at 18 (2d ed. 1974); Larry D. Barnett, *The Roots of Law*, 15 Am. U.J. Gender Soc. Pol'y & L. 613, 681-86 (2007)).

These longstanding legal attitudes towards under-21-year-olds continued into the Nineteenth Century. *Id.* at 202. By the end of that century, nineteen states and the District of Columbia had enacted laws expressly restricting the ability of under-21-year-olds to purchase or use particular firearms, or restricting the purchase of particular firearms before the age of majority. *Id.* (citing *State v. Quail*, 92 A. 859, 859 (Del. 1914); *State v. Allen*, 94 Ind. 441 (1884); *Tankersly v. Commonwealth*, 9

S.W. 702, 702 (Ky. 1888); *United States v. Rene E.*, 583 F.3d 8, at 14 (1st Cir. 2009). By 1923, twenty-two states and the District of Columbia made 21 the minimum age for purchasing at least certain firearms. *Id*. at 202 and n.16 (citing J.P. Chamberlain, *Legislatures and the Pistol Problem*, 11 A.B.A. J. 956, 598 (1925)).

In 1868, the adoption year of the Fourteenth Amendment, Thomas Cooley wrote an important treatise. *See* Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883); *see also Heller*, 554 U.S. at 616 (recognizing Thomas Cooley as a "judge and professor" "who wrote a massively popular 1868 Treatise on Constitutional Limitations"); *see also*, *BATF*, 700 F.3d at 203. Cooley wrote that "the State may prohibit the sale of arms to minors" under the State's police power. Cooley, *Treatise on Constitutional Limitations*, 740 n.4. He recognized the validity of age-based firearms regulations notwithstanding the protections of the Second Amendment. *Id* at 429.

Cooley discusses *State v. Callicutt*, an 1878 Tennessee case when the age of majority was set at 21. 69 Tenn. 714, 716 (1878); *see BATF*, 700 F.3d at 203; Cooley, *Treatise on Constitutional Limitations*, 740. *Callicutt* upheld a state-law misdemeanor conviction for selling, giving, or loaning a pistol to a minor. *Callicutt*, 69 Tenn. at 714-15. The defendant objected that his conviction violated the state's Second Amendment analogue. *Id*. at 716. *Callicutt* upheld the statute as "wise and salutary," and designed to "prevent crime," and did not abridge the right to keep and bear arms. *Id*. at 715-17. *See also Coleman v. State*, 32 Ala. 581, 582-83 (1858) (Alabama court similarly upholding underage firearms regulation when the age of

majority was 21).

On this record of historically analogous regulations, *BATF* upheld a federal statute regulating firearms sales to under-21-year-olds. *BATF*, 700 F.3d at 204.

###### 2. *The* McCraw I *Historical Analysis*

*McCraw I* largely adopts the *BATF* historical analysis. Plaintiffs dismiss this adoption, but it presents an important evolution in Fifth Circuit Second Amendment jurisprudence. *BATF* was a case about selling firearms to under-21-year-olds, and much—though by no means all—of its historical analysis addressed historical firearms sales regulation. *BATF*, 700 F.3d at 200-204, *McCraw I* regulated all possession of handguns by under-21-year-olds. *McCraw I*, 719 F.3d at 347. Thus, the Fifth Circuit has found historical age-based firearms sales regulations sufficiently historically analogous to modern, broader, age-based firearms regulations to pass the First Step. *BATF*, 700 F.3d at 204; *McCraw I*, 719 F.3d at 347.

## D. Plaintiffs' Own Historical Examples Are Unavailing

Plaintiffs cannot make a convincing case that historical precedent precludes age-based firearms regulation, or requires setting a minimum age for such regulations at 18. This section examines (1) the historical examples proffered by Plaintiffs; (2) how Plaintiffs' analysis of those examples does not comport with *Bruen*; (3) how Plaintiffs' analysis of those examples inconstant analogizing standards; (4) how Plaintiffs' historical examples, properly analyzed, help McCraw's case; and (5) how McCraw's analysis avoids the absurd results required by Plaintiffs' analysis.

*1. Plaintiffs' Historical Analysis*

*Hirschfeld I*. Plaintiffs' own historical analysis relies primarily on a vacated case from the Fourth Circuit, *Hirschfeld I*, 5 F.4th 407. It is well established that a vacated opinion has no precedential value. *Ridley v. McCall*, 496 F.2d 213, 214 (5th Cir. 1974); *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 468 (5th Cir. 2013). Moreover, although *Hirschfeld I* dealt with an age-based regulation on carrying firearms (under-21), the case notably makes no mention of an exemption from that age-based regulation for active-duty and honorably discharged military personnel over the age of 18. *Id*. In contrast, the Challenged Provisions make exception to their age-based carry restriction for active or honorably-discharged servicemembers. TEX. GOVT CODE §§ 411.174(g)(1)-(2).

The distinction is important because *Hirschfeld I* historical analysis of age-based weapons restrictions is limited to a single federal *militia* muster and its state clones. *See, Hirschfeld I*, 5 F.4th at 428 (citing Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271) ("Militia Act"). The Militia Act required able-bodied white men between 18 and 45 to enroll in the militia and, shortly thereafter, arm themselves with a musket and ammunition. Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271. Its state counterparts worked similarly. *Hirschfeld I*, 5 F.4th at 428-30.

*BATF II* Dissent. Plaintiffs also rely on the dissent from *BATF II*. 714 F.3d 334 (Jones, J., dissenting). That dissent also begins its analysis with a survey of militia regulations allowing 18-year-old militiamen to bear arms. *Id*. at 343-44. As noted above, the Challenged Provisions make the same allowance. TEX. GOVT CODE

§ 411.172(g)(1)-(2). The *BATF II* dissent acknowledges that the common law age of majority was 21, but argues that because under-21-year-olds were allowed to join the militia, it must be "inconceivable" that they were not permitted to keep and bear arms. *Id*. at 343. Yet the Challenged Provisions show precisely how one could conceive of a legal regime wherein under-21-year-olds are generally precluded from carrying certain arms in public, while making exception for those who are active or honorably discharged servicemembers. TEX. GOVT CODE § 411.172(a)(2); (g)(1)-(2). The remainder of the dissent's historical discussion is spent attacking the *BATF* panel historical analysis—which a majority of the Fifth Circuit refused to reconsider *en banc*, and which a later panel of the court adopted wholesale. *BATF II*, 714 F.3d at 335; *McCraw I*, 719 F.3d at 347.

> 2. *Plaintiffs' Analysis of Their Own Historical Examples Does Not Comport with* Bruen

Plaintiffs argue that to be historically analogous, the Challenged Provisions must set a minimum age for possessing firearms at 18—just like the Militia Act. But Plaintiffs insist on this level of specificity between Challenged Provision and historical example nowhere else. They do not argue that the Challenged Provisions must set a *maximum* age for possessing at 45, like the Militia Act did. Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271. They do not argue the Challenged Provisions must apply only to men, like the Militia Act did. *Id*. They do not argue the Challenged Provisions must only apply to men of a certain race (white), like the Militia Act did. *Id*. Plaintiffs' inconsistency is well-taken, but ultimately fatal to their arguments.

The historical analogy standard Plaintiffs propose, which requires identical

age requirements between the Challenged Provisions and the Militia Act in one instance, but such identity in age requirements in another—without explanation—is no standard at all. That the Militia Act only references firearms possession for white men while remaining silent as to women and people of other races and ethnicities only compounds the inconsistency of Plaintiffs' approach. The historical analogy standard either requires identity between challenged modern regulations and historical counterparts, or it does not. *Bruen* has already settled that question: no such identity is required. *Bruen*, at *12-14.

Moreover, the irony of Plaintiffs' historical examples is inescapable: the Militia Act's authorization of firearms possession excludes women entirely. Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271. Plaintiffs certainly do not argue that the Challenged Provisions must mimic that exclusion in order to be historically analogous. Such an argument would constitute the *opposite* of their as-applied-to-women claim. Plaintiffs' analysis thus requires absolute identity to one part of the Militia Act and absolute rejection of its other components. *Bruen* authorizes no such picking and choosing. Plaintiffs' analysis of their own historical examples does not comport with the *Bruen* test.

### 3. Plaintiffs' Insistence on Identical Modern and Historical Regulations is Nonsensical

Plaintiffs' framing of the issue—that historical public-carry firearms regulations mean the only minimum age available to modern lawmakers is 18—leads to absurd results. It cannot be the case that because some historical firearms regulations allowed 18-year-olds to possess firearms, modern regulations *must* use

16

that age.

As noted above, *Bruen*'s historical analysis requires no such rigid adherence to the specifics of ancient firearms regulations. If it did, then the Second Amendment could only apply to the specific firearms regulated in those ancient laws. Such reasoning absurd, and Supreme Court precedents expressly reject it. *Bruen* at *13 (citing *Heller*, 554 U.S. at 582)). In applying its historical analysis of firearms regulations, the Court has held not that the Second Amendment only protects those specific weapons available at the time of the regulation, but rather that such historical regulations show, more broadly, that the Second Amendment applies to weapons "in common use." *Heller*, 554 U.S. at 627 (citing *U.S. v. Miller*, 307 U.S. 174, 179 (1939)); *Bruen*, at *9 (citing *Heller*, 554 U.S. at 627 and *U.S. v. Miller*, 307 U.S. 174, 179 (1939) (further citations omitted)).

Similarly, historical age-based firearms regulations teach not that modern regulations must mirror the historical age at which some laws allowed for firearms possession, but instead demonstrate that age-based regulations of firearms is permissible. To hold otherwise would exceed *Bruen*'s reasonable requirement to ground modern firearms regulation in a historical understanding of Second Amendment rights. Instead, Plaintiffs' proposed overreliance on the details of ancient regimes would shackle modern legislatures—and modern firearms owners—to outdated statutes from long ago and far away.

### 4.  *Plaintiffs' Historical Examples Help McCraw's Case*

Rather than requiring absolute identity in some places and allowing for

irreconcilable differences in others, a proper application of the *Bruen* historical analogy standard shows that, to the extent Plaintiffs' historical examples are relevant at all, they bolster McCraw's defense.

Texas' age-based firearms regulations need not adopt *exactly* the historical age used in Plaintiffs' preferred historical examples. Instead, the Challenged Provisions and historical examples must simply be analogous. *See supra*, Section III.B.2. Texas' age-based regulations meet the *Bruen* historical analogy test even when evaluated against Plaintiffs' historical examples.

The same societal problem. The Challenged Provisions do not address the societal problem of mustering a militia, and that is a key difference between the two. The Challenged Provisions address public safety. However, the societal problems addressed by both the Challenged Provisions and Plaintiffs' historical examples address encompass the issue of when to entrust young people with firearms possession, and under what circumstances.

Affecting the core of the Second Amendment. The Challenged Provisions affect at least part of the central component of the Second Amendment right inasmuch as they regulate aspects lawfully carrying a firearm in public for self-defense. So, too, Plaintiffs' own historical examples—at least in part. While the Militia Act provides for militiamen supplying their own arms, it does not address walking around with firearms for quotidian self defense.

Not materially different means. Both the Challenged Provisions and Plaintiffs' historical examples address the intersection of military service, firearms, and age-

based regulations. Plaintiffs' historical examples demonstrate a longstanding history of allowing for possession of firearms commensurate with the age at which military service began. Both the Challenged Provisions and Plaintiffs' historical examples regulate this intersection of concerns using the same means: allowing firearms possession for military servicemembers from the age of 18. Under Texas law, active military and honorably discharged personnel aged 18 and over—both men and women—may obtain a handgun license. TEX. GOVT. CODE §§ 411.172(g)(1)-(2). The Militia Act and its state doppelgangers similarly permit military servicemen to possess firearms from age 18. Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271.

<u>Distinctly similar regulations</u>. Both the Challenged Provisions and the historical examples available for the Court's review here—those presented by Plaintiffs, as well as those considered by the Fifth Circuit—address this ongoing societal question in a way that is not simply "distinctly similar," but that is virtually identical: they emplace minimum age requirements. Indeed, it is difficult to conceive of historical laws so closely related to modern counterparts without being actually identical. The only difference is a three-year shift in the regulated age.

Plaintiffs insist the Challenged Provisions must be identical to historical laws in order to pass constitutional muster. Justice Thomas has already flatly rejected such notions: "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. At *13 (emphasis original). Here, the Challenged Provisions may not be the Militia Act's identical twin, but it is certainly its sibling. Proper application of the *Bruen* test

19

proves the Challenged Provisions are historically analogous, and constitutional under the Second Amendment.

### 5. *McCraw's Position Entails None of the Absurdities Produced by Plaintiffs' Analysis*

Plaintiffs may counter that McCraw's framing of the issue could also lead to absurd results, such as age-based restrictions that only allow for firearms possession between the ages of 45 and 47. But this case presents no such extreme. Texas' age-based regulations allow firearms possession a mere three years later than the Militia Act, meaning the challenged provisions are demonstrably analogous to even Plaintiffs' preferred historical age-based regulations. Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271. Plaintiffs' "parade of dreadfuls calls to mind wise counsel: 'Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom.'" *Buckley v. American Const. Law Found., Inc.*, 525 U.S. 182, 194 n.16 (1999) (quoting R. Bork, The Tempting of America: The Political Seduction of the Law 169 (1990)). A case may one day present the Court with a challenging question of whether an age-based regulation of the public carry of firearms is too far removed from historical examples to be analogous, but the Challenged Provisions are not that regulation, nor is this that case.

### E. Plaintiffs' As-Applied-To-Women Claim is Dead

*Bruen* eviscerates Plaintiffs' as-applied-to-women challenge. First, Plaintiffs offer no historical basis for that claim. Second, Plaintiffs' own pleadings demonstrate the claim only arises under the now-abrogated Second Step. Third, the historical analysis in *BATF* and *McCraw I* demonstrates the even if Plaintiffs brought their as-

applied-to-women claim under the First Step, it would fail. Notably, Plaintiffs'
supplemental briefing does not argue otherwise—or even mention their as-applied-
to-women claim. Dkt. 71. That brief only addresses Plaintiffs' facial challenge. *Id.*

      *1.  Plaintiffs Offer No Historical Basis for Their As-Applied-To-Women Claim*

      Plaintiffs do not allege the Challenged Provisions' facial gender neutrality is
ahistorical, or even that the Challenged Provisions' gender neutrality contravenes
historical precedent. They offer no historical precedent to support their claim, only
modern statistics. Plaintiffs make no effort to show historical firearms regulations
have allowed women to possess firearms where statistical data allegedly suggested
men were more dangerous. Nor could they. Indeed, their only historical example
authorizes firearms possession exclusively to men on the premise that men are
*actually more dangerous*, and thus suited for war. Act of May 8, 1792, ch. 33, § 1, 1
Stat. 271, 271. Plaintiffs thus fail to support their as-applied-to-women claim under
the *Bruen* standard.

      *2.  Plaintiffs' Pleadings Show Their As-Applied-To-Women Claim Arose
         Exclusively Under the Now-Abrogated Second Step*

      It is little surprise that Plaintiffs' offer no historical support for their as-
applied-to-women claim, because historical support would only have been required
under the First Step. Plaintiffs' pleadings make clear their as-applied-to-women
challenge arises under the now-abrogated Second Step. Their Complaint, summary
judgment brief, and response to McCraw's summary judgment brief plainly present
the as-applied-to-women claim under the now-abrogated Second Step.

      <u>Complaint</u>. The Complaint does not allege a historical basis for allowing

women possession of firearms so long as women appear less dangerous than men. Dkt. 1, ¶¶ 84-91. Instead, after reciting modern crime statistics, the Complaint alleges the State cannot show "any legitimate justification" for the Challenged Provisions as applied to women. *Id.* at ¶ 90.

Brief In Support of MSJ. Similarly, Plaintiffs' Brief in Support of their summary judgment motion takes up the as-applied-to-women argument exclusively in the context of the Second Step. Dkt. 58, p. 16. There, Plaintiffs admit their as-applied-to-women claim arises exclusively under the now-abrogated Second Step:

> As discussed above, the Carry Ban regulates conduct that falls within the scope of the Second Amendment and therefore this Court must consider whether the Government can "demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective" when applied to 18-to-20-year-old-women.

*Id.* (citing *BATF*, 700 F.3d at 195).

Not only does Plaintiffs' own language reveal their as-applied-to-women claim arises exclusively under the now-abrogated Second Step, Plaintiffs cite to *BATF*'s description of the Second Step. *Cf.* Dkt. 58, p. 16, *BATF*, 700 F.3d at 195. Plaintiffs follow that citation with a footnote: "Plaintiffs recognize this Court must apply intermediate scrutiny…." *Id.* at n.2. That's because Plaintiffs' as-applied-to-women challenge arises only under the now-abrogated Second Step analysis applying appropriate means-end scrutiny.

Response to McCraw's MSJ. Here, as in their other briefing, Plaintiffs only address their as-applied-to-women claim in the context of the Second Step. Dkt. 65, pp. 7-14. They argue that the text of the Second Amendment shows it must apply to

18-year-olds, and forego any historical analysis whatsoever regarding whether states may regulate firearms based on age and without regard to gender.

Plaintiffs make no serious effort to prevail on the First Step regarding their as-applied-to-women claim. Thus, without the Second Step, Plaintiffs' as-applied-to-women claim fails.

### 3. BATF's and McCraw I's *Historical Analysis Precludes Plaintiffs' As-Applied-To-Women Claim Under Step I*

Even if Plaintiffs brought their as-applied-to-women claim under the First Step, the Fifth Circuit's historical analysis forecloses such a claim. *See BATF*, 700 F.3d at 200-204; *McCraw I*, 719 F.3d at 347. The Fifth Circuit's previous discussion of age-based firearms regulations makes plain that, throughout our national history, laws have regulated Second Amendment rights of under-21-year-olds without regard to putative disparate impacts among men and women. *Id*. Indeed, Plaintiffs' own historical analogue, the Militia Act, affords men the opportunity to keep and bear arms for militia service, while making no such authorization for women. Militia Act, Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271. Thus, the Fifth Circuit's twice-adopted historical analysis demonstrates that age-based firearms regulations need not provide carve-outs for less-dangerous populations—and Plaintiffs' own proffered historical examples do not countenance otherwise.

*Bruen* is an important step forward in Second Amendment jurisprudence, but it does not save Plaintiffs' claims. Fifth Circuit precedent precludes Plaintiffs' claims even under *Bruen*' clarified analytical mandate, and Plaintiffs offer little in the way of salient historical support for the Second Amendment challenges. Plaintiffs' claims

fail, and the Court should dismiss them.

## CONCLUSION

For the foregoing reasons, McCraw requests the Court grant his motion for summary judgment, deny Plaintiffs' motion for summary judgment, dismiss Plaintiffs' claims with prejudice, and award McCraw such other and further relief to which he may be justly entitled.

Respectfully submitted:

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

CHRISTOPHER D. HILTON
Chief, General Litigation Division

/s/ *Ryan G. Kercher*
RYAN G. KERCHER
Texas Bar No. 24060998
Assistants Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
Ryan.Kercher@oag.texas.gov
***Counsel for Defendant
Steven McCraw***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ *Ryan G. Kercher*
RYAN G. KERCHER