## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

FIREARMS POLICY COALITION, INC. ET AL.,

    Plaintiffs,

v.

STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY, ET AL.,

    Defendants.

No. 4:21-cv-1245-P

## OPINION & ORDER

The Second Amendment protects the right of "the people" to keep and bear arms for self-defense.[1] Yet Texas prohibits law-abiding 18-to-20-year-olds from carrying a handgun for self-defense outside the home. Does the Second Amendment allow this blanket prohibition?

### BACKGROUND

Texas generally makes it illegal for 18-to-20-year-olds to carry a handgun for self-defense outside the home. Under Texas law, a "person commits an offense if the person: (1) intentionally . . . carries on or about his or her person a handgun; (2) at the time of the offense is younger than 21 years of age" unless that person is "on the person's own premises or premises under the person's control, or inside of or directly en route to a motor vehicle or watercraft that is owned by the person or under the person's control." TEX. PENAL CODE § 46.02(a).

---

[1]No less than the great civil rights leader Frederick Douglas wrote that "the liberties of the American people were dependent upon the Ballot-box, the Jury-box, and the Cartridge-box, that without these no class of people could live and flourish in this country." FREDERICK DOUGLASS, THE LIFE AND TIMES OF FREDERICK DOUGLASS: FROM 1817-1882 333 (1881).

This general prohibition, however, does not apply to an individual with a license to carry a handgun. *Id.* §§ 46.15(b)(6)(A), (B). But besides a few exceptions for military personnel, honorably discharged veterans, and persons protected by a protective order under either the Texas Family Code or the Texas Code of Criminal Procedure, law-abiding 18-to-20-year-olds are prohibited from being licensed to carry a handgun. *See* TEX. GOV'T CODE §§ 411.172(a)(2), (g), (h), (i). Simply stated, although Texans over the age of 21 can carry a handgun (either openly or concealed) outside the home (with or without a license), law-abiding 18-to-20-year-olds Texans are prohibited from carrying a handgun for self-defense outside the home.

Two individual plaintiffs, between the ages of 18 and 20, and the Firearms Policy Coalition, Inc., on behalf of its 18-to-20-year-old Texas members, challenge the constitutionality of Texas's statutory scheme that prohibits law-abiding 18-to-20-year-olds from carrying handguns for self-defense outside the home. Now before the Court are the Parties' cross-motions for summary judgment, which are ripe for review.

## LEGAL STANDARD

Summary judgment is appropriate where the movant demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 224 (5th Cir. 2020).

## ANALYSIS

The issue is whether *prohibiting* law-abiding 18-to-20-year-olds from carrying a handgun in public for self-defense is consistent with this Nation's historical tradition of firearm *regulation*. Based on the Second Amendment's text, as informed by Founding-Era history and tradition, the Court concludes that the Second Amendment protects against this prohibition. Texas's statutory scheme must therefore be enjoined to the extent that law-abiding 18-to-20-year-olds are prohibited from applying for a license to carry a handgun.

**A. Jurisdiction**

The Court starts with jurisdiction. The judicial power vested by Article III of the Constitution extends to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. Because federal-court jurisdiction is limited to cases or controversies, plaintiffs must "establish they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)); *see also Umphress v. Hall*, 500 F. Supp. 3d 553 (N.D. Tex. 2020) (Pittman, J.).

To establish standing, a plaintiff must demonstrate that: (1) he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) the injury was caused by the defendant, and (3) the injury would likely be redressed by the requested judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Here, the individual plaintiffs have standing to challenge the laws that prohibit them from carrying a handgun for self-defense outside the home. On this point, each plaintiff lives in and often travels to Parker, Fannin, and Grayson Counties. And but for the laws that prohibit them from carrying a handgun, both individual plaintiffs attest that they would carry a handgun while traveling in those counties for work and for school. But because carrying a handgun would violate the law—and necessarily expose them to a credible threat of enforcement, *see* ECF No. 38 ¶ 60—neither individual plaintiff will violate the laws before this challenge.

Based on declarations attesting to these facts, *see* ECF No. 59, the Court concludes that it has jurisdiction over this case and that the claims are ripe for review. When challenging the constitutionality of a statute, "a plaintiff need not violate the statute; [they] may meet [the] injury requirement by showing an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 345 (5th Cir. 2013) ("*McCraw*") (cleaned up). In this case, the individual plaintiffs have "demonstrate[d] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm*

*Workers Nat. Union*, 442 U.S. 289, 298 (1979). Accordingly, the Court concludes that the individual plaintiffs have standing.

The Firearms Policy Coalition ("FPC") has standing to sue on behalf of its members if: (a) any of its members would have standing to sue individually; (b) the interests it seeks to protect are germane to its purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Ass'n. of Am. Phys. & Surg., Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).

FPC has standing to challenge the laws that prohibit its members from carrying a handgun for self-defense outside the home. Here, the FPC is a coalition organized "to defend and promote the People's rights—including the right to keep and bear arms—advance individual liberty, and restore freedom." ECF No. 59 at 25. This lawsuit—which seeks to vindicate the right to bear arms for FPC's 18-to-20-year-old members—is clearly germane to serving that purpose. And as discussed above, the FPC's 18-to-20-year-old members have standing to sue individually. Accordingly, the Court concludes that FPC has standing to sue on behalf of its 18-to-20-year-old members. *See, e.g.*, *McCraw*, 719 F.3d 338; *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*").

Because Plaintiffs have standing to sue, the Court denies the Motion to Dismiss for Lack of Jurisdiction (ECF No. 32).

## B. Second Amendment Framework

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second (and the Fourteenth) Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022); *see also District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S.742 (2010). This right, however, is not unlimited: our Nation's historical tradition teaches that there are certain "longstanding," "presumptively lawful regulatory

measures" that the Second Amendment did not abrogate. *Heller*, 554 U.S. at 626–27, n.26.[2]

In *Bruen*, the Supreme Court reiterated the standard for applying the Second Amendment. In doing so, the Supreme Court rejected the two-step framework adopted by the courts of appeal, calling it "inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Bruen*, 142 S. Ct. at 2129.

Rather than means-end scrutiny, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2132. Stated another way, courts must first interpret the Second Amendment's text, as informed by history. And when the plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Id.* at 2129–30. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).

### C. Application to Texas's Categorical Prohibition

With this framework, the Court turns to the merits: whether Texas can prohibit law-abiding 18-to-20-year-olds from carrying a handgun for self-defense outside the home.

#### 1.  The Second Amendment's Text

The Court starts with the text. *See, e.g.*, *Shannon v. United States*, 512 U.S. 573, 580 (1994) (Thomas, J.) ("[W]e turn first, as always, to the text[.]"). If the plain text covers the proposed course of conduct, the

---

[2]One prominent, early commentator described the right to bear arms as "the true palladium of liberty . . . the right of self defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible." 1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES; AND OF THE COMMONWEALTH OF VIRGINIA 300 (1803).

Constitution presumptively protects that conduct. Here, Plaintiffs are law-abiding 18-to-20-year-olds seeking to carry a handgun for self-defense outside the home. It is undisputed that the "Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. The relevant question, therefore, is whether law-abiding 18-to-20-year-olds are afforded this protection.

### a. "Right of the People"

Are law-abiding 18-to-20-year-olds a part of "the people" mentioned in the Second Amendment? As explained below, the Court concludes that they are.

To start, the Second Amendment does not mention any sort of age restriction. This absence is notable—when the Framers meant to impose age restrictions, they did so expressly. *See, e.g.*, U.S. CONST. art. I, § 2 (age 25 for the House of Representatives); *id.* art. I, § 3 (age 30 for the Senate); *id.* art. II, § 1 (age 35 for the President). Instead, the Second Amendment refers only to "the people," which various Founding-Era dictionaries define as a reference to those who make up the "national community." *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044–45 (11th Cir. 2022) (quoting Noah Webster, *American Dictionary of the English Language* 600 (1st ed. 1828) ("The body of persons who compose a community, town, city, or nation.")); *see also* 2 Samuel Johnson, *A Dictionary of the English Language* 305 (6th ed. 1785) ("A nation; those who compose a community.")).

In accord with that understanding, *Heller* said that "the people" is a term of art that refers to "all members of the political community, not an unspecified subset." 554 U.S. at 580. *Heller*'s interpretation found support in an earlier decision, *United States v. Verdugo-Urquidez*, which considered the Fourth Amendment's reference to "the people." 494 U.S. 259 (1990). There, the Court interpreted the phrase to encompass those "persons who are part of a national community" or those who have "sufficient connection with this country to be considered part of that community." *Id.* at 265. And without challenging *Heller*'s interpretation, *Bruen* said it was undisputed that "ordinary, law-abiding, adult citizens

[] are part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. "The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at 2131 (quoting *Heller*, 554 U.S. at 635).

With this guidance, the Court asks a simple question: are law-abiding 18-to-20-year-olds properly considered members of the political community and a part of the national community? The answer is yes. And based on that answer, the Court concludes that law-abiding 18-to-20-year-olds are a part of "the people" referenced in the Second Amendment. This conclusion is unsurprising: *Heller* stated that the "Second Amendment right is exercised individually and belongs to *all Americans.*" *Heller*, 554 U.S. at 581 (emphasis added).

Other constitutional provisions bolster this Court's interpretation of "the people." The First and Fourth Amendments, like the Second Amendment, refer to "the people." And both *Heller* and *Verdugo-Urquidez* suggest that the term "the people" is defined consistently throughout the Constitution. On this point, the First Amendment has been interpreted to apply to all persons, even those under the age of 18. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (free speech); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (free exercise). And while the First Amendment is limited in some contexts (such as the forum or content of the speech), age does not serve as a basis for eradicating the right. *See Tinker*, 393 U.S. at 506 ("First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.").

The Fourth Amendment likewise protects individuals regardless of age. *See New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985). To be sure, the context of a search—e.g., whether on or off school property—can affect the expectations of privacy. *Id.* at 337–40. But the expectation of privacy is not affected based on the age of the person being searched. Rather, the *context* of a search is the distinguishing factor. *See id.*

Thus, because neither the First nor Fourth Amendments exclude—nor have been interpreted to exclude—18-to-20-year-olds, the Court declines to read an implicit age restriction into the Second Amendment.

Beyond the First and Fourth Amendments, other constitutional provisions, which do not specifically mention "the people," support the Court's conclusion that "the people" protected by the Second Amendment include 18-to-20-year-olds. On this point, neither the Fifth Amendment nor the Fourteenth Amendment exclude—or have been interpreted to exclude—18-to-20-year-olds. *See, e.g.*, *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2210 (2016) (equal protection); *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (due process); *Kent v. Dulles*, 357 U.S. 57, 65–66 (1958) (travel); *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) (equal educational opportunities). Likewise, in the Eighth Amendment context, the Supreme Court has said that where "a line must be drawn," "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood." *Roper v. Simmons*, 543 U.S. 551, 574 (2005).[3] The Court continues this line of interpretation and concludes that 18-to-20-year-olds are protected by the Second Amendment.

With this conclusion, the Court now determines if interpreting "the people" to include 18-to-20-year-olds is consistent with the rest of the Second Amendment's text. The Second Amendment contains two clauses: the prefatory clause, which announces the purpose of the Second Amendment, and the operative clause. And "[l]ogic demands that there be a link between the stated purpose and the command." *Heller*, 554 U.S. at 595, 599. The Court must therefore determine whether its interpretation of "the people" is logically linked to the prefatory clause (and its stated purpose).

*Heller* explained that a prefatory clause does not limit its operative clause. Instead, the prefatory clause here announces the Second Amendment's purpose is to "prevent elimination of the militia." *Id.* This

---

[3]For further discussion regarding how various constitutional provisions apply with varying level of force based on age, *see Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322, 328 (4th Cir. 2021).

stated purpose provides further evidence that the Second Amendment protects law-abiding 18-to-20-year-olds. *Id.* at 577 (noting that the "requirement of [a] logical connection may cause a prefatory clause to resolve an ambiguity in the operative clause").

As stated above, there must be a link between the stated purpose and the command. And given the Second Amendment's stated purpose, logic demands that if an individual was (or is) a member of the "militia," the Second Amendment's protections extend at least to those who constitute the militia. That is, although the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn. *See* THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (1880). It would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn.[4]

So who are these militia members? In *United States v. Miller*, the Supreme Court explained that "the Militia comprised all males physically capable of acting in concert for the common defense." 307 U.S. 174, 179 (1939). And in *Heller*, the Supreme Court affirmed this definition, stating that it "comports with founding-era sources." *Heller*, 554 U.S. at 595 (collecting sources). Thus, at the Founding, the "militia" was generally understood to be comprised of "all able-bodied men," which included 18-to-20-year-olds. *Id.* at 596.

The historical record supports this understanding. The First Congress enacted legislation "command[ing] that every able-bodied

---

[4] William Rawle, an early Constitutional scholar and the first United States Attorney for Pennsylvania, provides the following insight:

> Although in actual war, the services of regular troops are confessedly more valuable; yet; while peace prevails, . . . the militia form the palladium of the country. . . . The corollary, from the first position, is, that the right of the people to keep and bear arms shall not be infringed. The prohibition is general. No clause in the Constitution could by any rule of construction be conceived to give congress a power to disarm the people.

WILLIAN RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 125–26 (2d ed. 1829).

male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones v. Bonta*, 34 F.4th 704, 719 (9th Cir. 2022) (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (alterations omitted)). Additionally, the 1792 Act required militia members to arm themselves rather than rely on the Government to provide arms. *See Miller*, 307 U.S. at 179 (recognizing that the militia presupposed firearm possession because "when called for service[,] these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time"). Likewise, at the time of the founding, most states had similar laws requiring militia service for 18-to-20-year-olds. *See generally Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 714 F.3d 334 (5th Cir. 2013) (Jones, J., dissenting). Thus, the undisputed historical evidence establishes that 18-to-20-year-olds were understood to be a part of the militia in the Founding Era.[5] *See Heller*, 554 U.S. at 596 (explaining that the Constitution assumed the militia to exist at the time it was drafted). And because 18-to-20-year-olds were (and are) a part of the militia, the Second Amendment must protect their right to keep and bear arms.

The Court thus concludes the plain text of the Second Amendment, as informed by Founding-Era history and tradition, covers the proposed

---

[5]This original understanding of who is a member of the militia has remained consistent over the course of this Nation's history. *See* 10 U.S.C. § 246(a) ("The militia of the United States consists of all able-bodied males at least 17 years of age . . . ."); *cf.* Burke Davis, The Civil War, Strange & Fascinating Facts 63 (1982) ("More than 2,000,000 Federal soldiers were twenty-one or under (of a of a total of some 2,700,000) [in the Civil War.]").

In fact, it is worth noting several of America's greatest military heroes were under 21 years of age at the time of their acts of valor. For example, George Washington's "adopted son," Gilbert du Motier, Marquis de Lafayette, was only 19 years old when he was made a major general in the Continental Army. Joseph J. Ellis, His Excellency, George Washington, 115–16 (2004). And at only 19 years of age, Arthur MacArthur, Jr.—the "Boy Colonel" of the Civil War and father of General Douglas MacArthur—received the Medal of Honor for gallantry in action at the Battle of Missionary Ridge in 1863. Geoffrey Perret, Old Soldiers Never Die, The Life of Douglas MacArthur 5–7 (1996). Moreover, World War II's most decorated soldier—a Texan named Audie Murphy—was also only 19 when he received the Medal of Honor for his actions at the Colmar Pocket on the Franco-German border. Don Graham, No Name on the Bullet: A Biography of Audie Murphy 101 (1989).

course of conduct and permits law-abiding 18-to-20-year-olds to carry a handgun for self-defense outside the home.

> ### b. *Texas cannot rebut the Court's conclusion that the plain text covers the proposed course of conduct.*

Texas unsuccessfully attempts to avoid this holding by claiming that the Court's conclusion is foreclosed by Fifth Circuit precedent. To support its argument, Texas points to *NRA*, 700 F.3d 185, and *McCraw*, 719 F.3d 338. These cases analyzed the Second Amendment under the two-step framework repudiated by *Bruen*.[6] Texas argues that because *Bruen* abrogated only the Step Two analysis, the Step One analysis in both cases remains binding precedent.

The Court agrees that *Bruen* overruled any Fifth Circuit precedent as to the Step Two analysis. But the Court disagrees that the Step One analysis of *NRA* and *McCraw* are binding here. Neither case purported to resolve the relevant issues based solely on a Step One analysis. *First*, *NRA* concluded its Step One analysis by stating that, although "it [was] inclined to uphold the challenged federal laws at step one of [its] analytical framework," it "ultimately concluded that the challenged federal laws pass muster even if they implicate the Second Amendment guarantee." 700 F.3d at 204. *Second*, *McCraw*, which purported to follow *NRA*, underscored the limited nature of *NRA*'s Step One analysis: "[U]nder circuit precedent, we conclude that the conduct burdened by the Texas scheme *likely* 'falls outside the Secondment Amendment's protection." 719 F.3d at 347 (emphasis added).

As apparent from this language, Step One analysis neither demands a certain result nor can it be considered a "necessary prerequisite to the holding" that would bind a future court. *In re Ulta Petroleum Corp.*, 28 F.4th 629, 641 (5th Cir. 2022). The Step Two analysis—not the Step One

---

[6]Before *Bruen*, the Fifth Circuit utilized a two-step framework. At Step One, courts determined whether the challenged law impinged upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee. At Step Two, courts would determine whether the law survived the proper level of scrutiny. As *Bruen* made clear, Step Two was incompatible with *Heller* and the Second Amendment.

analysis—is necessary for the result in both *NRA* and *McCraw*. Accordingly, the Court concludes that neither *NRA* nor *McCraw* is dispositive here. *Cf. Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394–95 (1981) (noting the distinction between a "likelihood of success" on the merits—which is the language used in *McCraw*—and actual "success" on the merits). Thus, the Court considers the Step One analysis only to the extent that it persuades this Court that the Second Amendment's plain text does not cover the proposed course of conduct at issue here.

On this point, the Court finds neither *NRA* nor *McCraw* persuasive. In *NRA*, the Fifth Circuit considered the constitutionality of 18 U.S.C. § 922(b)(1) and (c)(1), which prohibit federally licensed firearms dealers from selling handguns to persons under the age of 21. *NRA,* 700 F.3d at 188. That issue, which centered on law-abiding 18-to-20-year-olds *purchasing* handguns, is wholly different than the issue here—whether law-abiding 18-to-20-year-olds can carry a handgun for self-defense outside the home.

Further, courts must start and end with the text.[7] As an interpretive tool, courts may consult the historical record to determine what the public may have understood that text to mean at the time it was ratified or codified. *NRA*, however, failed to grapple with the text of the Second Amendment. Instead, as Judge Jones explains, the Fifth Circuit considered only "Founding-Era Attitudes." Thus, instead of first determining whether the Second Amendment's plain text covers the proposed conduct (as *Heller* and *Bruen* command), *NRA* considered only what (a portion of) the historical record revealed about general Founding-Era attitudes. While the Founders' attitudes can inform a

---

[7]As Chief Justice John Marshall eloquently stated 195 years ago:

> To say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them, nor contemplated by its framers . . . .

*Ogden v. Sanders*, 25 U.S. (12 Wheat) 213, 332 (1827) (Marshall, C.J. dissenting).

court of the public's understanding of a specific text at the time it was ratified, that understanding must be tethered to an interpretation of the text itself. And on this point, *NRA* failed to explain how those "attitudes" informed the public of what the text of the Second Amendment meant when it was ratified. Thus, *NRA* is not persuasive as to whether the Second Amendment's plain text covers law-abiding 18-to-20-year-olds carrying a handgun for self-defense outside the home. And because *McCraw* adopted *NRA*'s Step One analysis without any further discussion, it suffers from the same shortcoming and is also unpersuasive in this case.

The Court thus disagrees with Texas's interpretation of the Second Amendment's text and the historical understanding of that text. Thus, the analysis moves to Texas's attempt to justify its regulation by showing it is consistent with the Nation's historical tradition of firearm regulation.

### 2. This Nation's Historical Tradition of Gun Regulation

*Bruen* is clear: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2129–30. Because (as detailed above) the plain text covers ordinary, law-abiding 18-to-20-year-olds carrying a handgun for self-defense outside the home, that conduct is presumptively protected by the Constitution. The burden therefore falls on Texas to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Because Texas failed to carry its burden, the law must be enjoined.

Courts use analogical reasoning to determine whether a modern regulation is constitutional. Such reasoning "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. This necessarily requires courts to understand and compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* Thus, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably

justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767). However, the regulation-in-question need not be "a dead ringer for historical precursors" to withstand challenge. *Id.*

> a. *The "longstanding," "presumptively reasonable restrictions" articulated by* Heller *and* Bruen *do not apply here.*

Before analyzing the historical analogues that Texas presents, the Court first considers whether this case is analogous to the specific kinds of restrictions that both *Heller* and *Bruen suggested* are constitutional. As explained below, none resolve this case.

*First*, the relevant restriction here is Texas prohibiting law-abiding 18-to-20-year-olds from carrying a handgun for self-defense outside the home. Thus, Texas's restriction hinges solely on the person's age. Because age is the distinguishing factor, Texas's statutory scheme is therefore not analogous to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626; *Bruen*, 142 S. Ct. at 2133–34.

*Second*, Texas's prohibition does not distinguish between a law-abiding 18-to-20-year-old carrying a handgun *openly* and a law-abiding 18-to-20-year-old carrying a handgun *concealed*. And rather than implementing a "reasonable regulation" specific to the "manner of public carry,"—e.g., to guard against individuals "carry[ing] deadly weapons in a manner likely to terrorize others"—Texas categorically prohibits law-abiding 18-to-20-year-olds from publicly carrying handguns. *Bruen*, 142 S. Ct. at 2150. Accordingly, Texas's laws cannot be upheld based on the "historical evidence from antebellum America" showing that "the *manner* of public carry was subject to reasonable regulation." *Id.* ("States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").

*Third*, Texas is a shall-issue state. This means Texas implements nondiscretionary licensing restrictions. Texas, however, prohibits law-abiding 18-to-20-year-olds from applying for such a license. Thus, although *Heller* and *Bruen* reiterated that "nothing" "should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-

issue' licensing regimes," *id*. at 2139 n.9, a shall-issue regime cannot allow a state to prohibit a class of persons from exercising their Second Amendment right solely based on their age.

On this point, Texas argues that the Supreme Court's reassurances bar Plaintiffs' claims. But Texas misunderstands Plaintiffs' requested relief. Instead of enjoining the entire statutory scheme, Plaintiffs seek to enjoin only provisions that prohibit them from applying for a license to carry a handgun. Thus, it is consistent with the Supreme Court's reassurances to require Texas to provide 18-to-20-year-olds the opportunity to satisfy whatever nondiscretionary licensing restrictions Texas chooses.

*Fourth*, this case does not involve gun ownership by felons or the mentally ill. *Heller*, 554 U.S. at 626–27; *Bruen* 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

*Fifth*, this case does not entail the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id*.

*Finally*, this case is not about "laws imposing conditions or qualifications on the commercial sale of arms." *Id*.

Accordingly, the specific kinds of restrictions that both *Heller* and *Bruen* indicated are constitutional and do not resolve this case. The Court thus turns to Texas's arguments.

### b.  Texas's Historical Analogue Arguments

As *Bruen* made clear, Texas must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *See id*. at 2127. Texas argues that the "thorough and compelling" historical analysis in *NRA* satisfies this burden.[8] The Court, however, is unpersuaded. To start,

---

[8]Here, "[t]he job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies." *Bruen*, 142 S. Ct. at 2130 n.6 (emphasis in original). And "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States* v. *Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020). Courts are thus entitled to decide a case based on the historical record compiled by the parties. *Bruen*, 142 S. Ct. at 2130 n.6.

*NRA* failed to grapple with the Second Amendment's text. Likewise, as Judge Jones stressed in her dissent, *NRA* failed to conduct a tailored historical analysis.

*NRA* discussed four types of historical evidence: (1) Founding-Era "gun safety regulations," (2) laws "that targeted particular groups for public safety reasons," (3) the age of majority at the time of the Founding, and (4) state laws—starting in the second half of the 19th century—"restricting the ability of persons under 21 to purchase or use particular firearms." *NRA*, 700 F.3d at 200–03.

But based on *Bruen*'s guidance, *NRA*'s historical analysis is not enough to support Texas's prohibition. To be sure, *Bruen* stressed that modern firearms regulations need not be a "dead ringer for historical precursors" and a law will pass constitutional muster if it is "analogous enough" to historical firearms restrictions." *Id.* at 2133. Courts, however, must be able to conclude modern and historical regulations impose a "comparable burden" that is "comparably justified." *Id.* Here, however, the Court concludes that Texas failed to carry its burden on this point.

*NRA* cited to only a few restrictions that dated back to the time of the Second Amendment's ratification: "laws regulating the store of gun powder," "administering gun use in the context of militia service," and "prohibiting the use of firearms on certain occasions and in certain places." *NRA*, 700 F.3d at 200. These regulations, however, are not sufficient historical analogs to Texas's statutory scheme that prohibits law-abiding 18-to-20-year-olds from carrying a handgun for self-defense outside the home. *See Heller*, 554 U.S. at 632 (explaining that these sorts of regulations "provide no support for [a] severe restriction" since "they do not remotely burden the right of self-defense as much as an absolute ban on handguns").

*NRA*'s reference to laws "that targeted particular groups for public safety reasons" is also insufficient historical analogs to support Texas's statutory scheme. *NRA*, 700 F.3d at 200. The Supreme Court has repeatedly recognized the presumed constitutionality of "longstanding prohibitions on the possession of firearms by felons and the mentally ill."

*Heller*, 554 U.S. at 626–27; *Bruen* 142 S. Ct. at 2162 (Kavanaugh, J., concurring). But this recognition of *specific* "longstanding prohibitions" does not support a *general* prohibition on almost all 18-to-20-year-olds— just because of their age.

Instead, the longstanding prohibitions regarding felons and the mentally ill were based on an *individualized* determination that allowing the person in question unfettered access to firearms would pose a threat to public safety. Texas's statutory scheme does the opposite. The scheme starts by prohibiting 18-to-20-year-olds from carrying a handgun for self-defense outside the home. Only if a rare exception applies may an 18-to-20-year-old seek to obtain a license to carry. And rather than determining that a person in question is a threat to public safety, certain exceptions require an individualized determination before allowing a person to exercise their Second Amendment rights. *See* TEX. GOV'T CODE § 411.172(i) (allowing an 18-to-20-year-old to become "eligible for a license to carry a handgun if the person is protected under an active protected order" issued under the Texas Family Code or Texas Code of Criminal Procedure).

*NRA* also focused on the age of majority. At the Founding, the common law age of majority was 21 years old. States did not enact legislation lowering the age of majority to 18 until the 1970s. *Compare* U.S. CONST. amend. XXVI (the amendment lowering the voting age of U.S. citizens from 21 to 18 years of age was ratified by the states on July 1, 1971), *with NRA* 700 F.3d at 201 (recognizing it was not until the 1970s that the States enacted legislation lowering the age of majority from 21 to 18). Texas thus argues the Second Amendment cannot protect the rights of those whom the Founding Era considered to be infants in the eyes of the law. The age of majority, however, tells us very little about the scope of the Secondment Amendment's protections; reliance on the age of majority does not move the needle in favor of either party.

Generally, the Second Amendment guarantees "the right of the people to keep and bear Arms," and the "people" referred to in the Bill of Rights have always been understood to be "the whole people." THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880). More specifically, "the

age of majority—even at the Founding—lacks meaning without reference to a particular right. 1 WILLIAM BLACKSTONE, COMMENTARIES 463–65 (1765). Instead, the relevant age of majority depends on capacity or activity. *See id.* at 463–65 (recognizing the "different capacities which [individuals] assume at different ages"). As a result, "constitutional rights were not generally tied to an age of majority, as the First and Fourth Amendments applied to minors at the Founding as they do today." *Hirschfeld*, 5 F.4th at 435.

Further, neither *NRA* nor Texas points to any laws—premised on the common law age of majority—that is a sufficient historical analog to support Texas's statutory prohibition. This is relatively expected: The militia was composed of those that had yet to attain the age of majority. Thus, the Court concludes that the age of majority cannot support Texas's statutory scheme. *See Heller*, 554 U.S. at 612–13 (quoting *Nunn v. Georgia*, 1 Ga. 243, 250 (1846)).

Finally, *NRA* focused on state laws at the end of the 19th century that "restrict[ed] the ability of persons under 21 to purchase or use particular firearms." *NRA*, 700 F.3d at 202. The earliest law cited is from 1856. Accordingly, *NRA*'s "thorough and compelling" historical analysis is void of any laws from the Founding Era. On this point, the historical record before the Court establishes (at most) that between 1856 and 1892, approximately twenty jurisdictions (of the then 45 states) enacted laws that restricted the ability of those under 21 to "purchase or use firearms." *See id.* And by 1923, three more states joined with similar laws. *Id.* But the record stops short and does not show any "historical analogs" from the Founding Era.

This case therefore presents the Court with an important question: What history should a court consider? To this point, *Bruen* recognized an "ongoing scholarly debate" on whether the Fourteenth Amendment's ratification in 1868 imbued the Second Amendment with a new and different meaning to the States than it had to the Federal Government in 1791. *Bruen*, 142 S. Ct. at 2138.

The Supreme Court nonetheless clarified that the "post-Civil war discussion of the right to bear arms, [which] 'took place 75 years after

the ratification of the Second Amendment, . . . do[es] not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2137–38 (quoting *Heller*, 554 U.S. at 614). *Bruen* "should not be understood to endorse freewheeling reliance on historical practice form the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *See id.* at 2163 (Barrett, J., concurring). Thus, despite the "ongoing scholarly debate," *Bruen* recognized the Supreme Court has "made clear that the individual rights enumerated in the Bill of Rights and made applicable through the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* at 2137 (citing *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020); *Timbs v. Indiana*, 139 S. Ct. 682 (2019); *Malloy v. Hogan*, 378 U.S. 1, 10 (1964)).

To uphold Texas's statutory prohibition on this record, this Court would have to "giv[e] postenactment history more weight than it can rightly bear." *See id.* at 2136. Thus, the Court concludes Texas failed to produce sufficient historical analogs from the Founding Era *and* the Reconstruction Era to support its statutory prohibition. The Court therefore enjoins the Texas laws to the extent they prohibit law-abiding 18-to-20-year-olds from applying for a license to carry a handgun.[9]

Even if the Court focuses too heavily on Founding-Era history rather than exclusively on Reconstruction-Era history, Texas still failed to carry its burden. At most, Texas's historical analogs show only that, by 1923, 22 states had laws imposing general restrictions on "the purchase or use of firearms" for those younger than 21. Based on *Bruen*'s guidance, however, the Court concludes these laws cannot sufficiently establish that a *prohibition* on law-abiding 18-to-20-year-olds carrying a handgun in public for self-defense is consistent with this Nation's historical tradition of firearm *regulation*.

### D. The Court stays this injunction for 30 days, pending appeal.

Federal Rule of Civil Procedure 62(a) provides an automatic stay upon a judgment's execution for thirty days. FED. R. CIV. P. 62(a). For a

---

[9]Though Texas cannot impose a "substantial burden on public carry" for 18-to-20-year-olds, Texas could, under *Bruen*, require 18-to-20-year-olds to satisfy additional objective criteria when compared to those above the age of 21.

final judgment that grants an injunction, however, there is no automatic stay. *Id.* The Court may exercise its discretion to "suspend [or] modify" an injunction pending appeal if it provides "terms that secure the opposing party's rights." *Id.* at 62(d). The relevant factors in determining if a court should stay an injunction pending appeal are: (1) whether the party against whom the injunction was granted made a strong showing of a likelihood of success on the merits; (2) whether the party against whom the injunction was granted will be irreparably injured absent a stay; (3) whether a stay will substantially injure the other parties' interests; and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Hunt v. Bankers Tr. Co.*, 799 F.2d 1060, 1067 (5th Cir. 1986); 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2904 (3d ed.). Despite these clear-cut factors, the decision to issue a stay pending appeal "contemplate[s] individualized judgments in each case," and it "cannot be reduced to a set of rigid factors." *Hilton*, 481 U.S. at 777.

Here, the Court ultimately concludes it should stay the injunction for thirty days, pending appeal. Of the four factors at issue in this test, only the first factor is a close call. As discussed above, determining the "historical analog" of a regulation presents many questions without fully formed answers. For instance, different interpretations on whether Reconstruction-era history is applicable or how closely a valid regulation must hew to its predecessor could, for instance, alter the outcome of this case. The Court's crystal ball is further clouded by the fact that the Fifth Circuit twice upheld this regulation under previous challenges. Thus, the Court concludes Texas has a likelihood of success if this judgment is appealed to the Fifth Circuit.

The remaining three factors all weigh heavily in favor of granting an injunction. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Tex. Surg. Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). Texas also has an interest in the full adjudication of this issue before it issues potentially invalid licenses to carry a handgun. Further, Texas's "interest and harm merges with that of the public." *Id.*

Though Plaintiffs' interest in the vindication of their Constitutional rights suffers while the judgment is stayed, the stay is necessary to militate the possible negative effects of relying on the injunction while it is subject to appellate review and possible reversal. If the Court's decision is reversed after Plaintiffs rely on it to purchase and carry handguns or apply for licenses to carry, they may be subject to the very criminal liability they sought to avoid. While acknowledging the unusual circumstance of *sua sponte* staying its own injunction, the Court concludes that "a temporary stay is appropriate to 'suspend[] judicial alteration of the status quo'" because it "will allow [the Fifth Circuit] to hear oral arguments and rule on the merits." *Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017) (quoting *Nken v. Holder*, 556 U.S. 418, 429 (2009)). After review of all relevant factors, the Court stays its judgment and injunction for thirty days or pending the final disposition of any appeal that may result from this judgment.

### E. Plaintiffs are not barred from seeking fees if they ultimately prevail on the merits.

Defendants Glazer and Smith argue that Plaintiffs are barred from the recovery of attorneys' fees against them. They argue that they are entitled to sovereign, qualified, and prosecutorial immunity. They also argue that Plaintiffs may not seek injunctive relief under the doctrine of *Ex Parte Young* while also bringing a claim under § 1983—that Plaintiffs must choose between the remedies.

The "American Rule" remains that parties must bear their own costs and attorneys' fees. Yet under 42 U.S.C. § 1988, the prevailing party in a civil rights case under § 1983 ordinarily should recover attorneys' fees unless special circumstances would render such an award unjust. *See Blanchard v. Bergeron*, 489 U.S. 87, 91 (1989). Further, attorneys' fees awarded "ancillary to prospective relief [are] not subject to the strictures of the Eleventh Amendment." *Missouri v. Jenkins*, 491 U.S. 274, 279 (1989). And when state sovereign immunity applies, "Congress had spoken sufficiently clearly to overcome [it] in enacting § 1988." *Id.* Therefore, if Plaintiffs' claims arise out of § 1983 and accordingly are entitled to recover under § 1988, Defendants' arguments about sovereign immunity must fail.

Further, if Plaintiffs' claim arose out of the doctrine of *Ex Parte Young*, the award of attorneys' fees is not barred by an immunity argument. The award of attorneys' fees is "ancillary" to an injunction. *Id.* at 279. It does not "compensate"; rather, it "reimburses [the plaintiff] for a portion of the expenses [] incurred in seeking prospective relief." *Hutto v. Finney*, 437 U.S. 678, 695 n.24 (1978). Again, Defendants' arguments that they may invoke sovereign immunity to escape paying fees fail.

Finally, Defendants' own cases appear to contradict their theory that a § 1983 claim precludes relief under *Ex Parte Young* or *vice versa. See, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) (holding that Congressional authority to enact legislation pursuant under Section 5 of the Fourteenth Amendment supersedes Eleventh Amendment Immunity). Thus, the Court cannot conclude that the Plaintiffs are barred as a matter of law from seeking attorneys' fees. Therefore, Defendant's motion to bar attorneys' fees is **DENIED.**

## ORDER

As explained, the Court concludes that it has jurisdiction and that Plaintiffs' claims are ripe for review. The Court therefore **DENIES** Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF No. 32).

Further, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 57) and **DENIES** Defendants' Motions for Summary Judgment (ECF Nos. 45, 48, 51).

Accordingly, the Court **ORDERS** that:

1. To the extent that Texas's statutory scheme, TEX. PENAL CODE § 46.02(a) and TEX. GOV'T CODE §§ 411.172(a)(2), (g), (h), (i), prohibits law-abiding 18-to-20-year-olds from carrying handguns for self-defense outside the home based solely on their age, this statutory scheme violates the Second Amendment, as incorporated against the States via the Fourteenth Amendment.

2. Defendants and all their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **ENJOINED** and

22

**RESTRAINED** from enforcing Texas's statutory scheme against law-abiding 18-to-20-year-olds based solely on their age.

3. This injunction is hereby **STAYED** for **thirty days**, or pending appeal, for the duration of the appellate process.

**SO ORDERED** on this **25th day** of **August 2022.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

23